1998 ME 232

**DARLING'S d/b/a Darling's Bangor Ford**

v.

**FORD MOTOR COMPANY.**

Supreme Judicial Court of Maine.

Argued Oct. 5, 1998.

Decided Oct. 27, 1998.

Warren M. Silver (orally), Karen D. Kemble, Silver & Perry, P.A., Bangor, for plaintiff.

Andrew M. Horton (orally), Verrill & Dana, LLP, Portland, and Michael R. Feagley, Mayer, Brown & Platt, Chicago, IL, for defendant.

Gerald F. Petrucelli, Bruce A. McGlauflin, Petrucelli & Martin, LLP, Portland, for American Ass'n of Automobile Manufacturers and Int'l Ass'n of Automobile Manufacturers.

Jason Caron, Bruse Gerrity, Preti, Flaherty, Beliveau & Pachios, LLC, Portland, for Maine Automobile Dealers Ass'n and Nat'l Automobile Dealers Ass'n.

Before WATHEN, C.J., and CLIFFORD, RUDMAN, ALEXANDER, and CALKINS, JJ.

ALEXANDER, Justice.

[¶ 1]   The United States District Court for the District of Maine (*Hornby, C.J.*) acting pursuant to 4 M.R.S.A. § 57 (1989) and M.R.Civ.P. 76B,[1] has asked for instructions

---

**1.**  4 M.R.S.A. § 57 (1989) provides in relevant part:

> When it shall appear to the Supreme Court of the United States, or to any court of appeals or district court of the United States, that there

are involved in any proceeding before it one or more questions of law of this State, which may be determinative of the cause, and there are no clear controlling precedents in the decisions of the Supreme Judicial Court, such federal court

regarding the interpretation of the motor vehicle warranty reimbursement statute, 10 M.R.S.A. § 1176 (1997).[2] Specifically, the District Court certified the following questions to this Court:

A. (1) Does 10 M.R.S.A. § 1176 require a dealer/franchisee to make a "particularized claim"[3] to a manufacturer in seeking reimbursement for warranty work?

(2) If yes, does a formal demand letter specifying (a) the original computerized claim number; (b) the retail amount claimed; (c) the amount the dealer received under the nationalized system; (d) the nature of the claim (parts or labor); and (e) the difference between the amount received and the retail price, meet the "particularized claim" requirement?

B. Does the term "labor rate"[4] in the statute include pricing systems whereby the dealer/franchisee consults sources for the number of hours to assign and then multiplies that number by its hourly rate regardless of the amount of time actually spent and regardless of the amount of time the manufacturer/franchisor thinks is appropriate (so-called "flat rate" pricing)?

C. Under 10 M.R.S.A. § 1174(1), can a dealer/franchisee use a published table of labor times even though those times are greater than what the manufacturer/franchisor concludes are reasonable for the repair transaction?

D. If flat rate labor pricing is permitted under the statute and if a dealer/fran-

may certify any such questions of law of this State to the Supreme Judicial Court for instructions concerning such questions of state law, which certificate the Supreme Judicial Court, sitting as the Law Court, may by written opinion, answer.

M.R.Civ.P. 76B provides the procedural requirements for certifying questions.

2. 10 M.R.S.A. § 1176 (1997) provides in relevant part:

If a motor vehicle franchisor requires or permits a motor vehicle franchisee to perform labor or provide parts in satisfaction of a warranty created by the franchisor, the franchisor shall properly and promptly fulfill its warranty obligations, in the case of motor vehicles over 10,000 pounds gross vehicle weight rating, shall adequately and fairly compensate the franchisee for any parts so provided, and in the case of all other motor vehicles, shall reimburse the franchisee for any parts so provided at the retail rate customarily charged by that franchisee for the same parts when not performed in satisfaction of a warranty. Further, the franchisor shall reimburse the franchisee for any labor so performed at the retail rate customarily charged by that franchisee for the same labor when not performed in satisfaction of a warranty; provided that the franchisee's rate for labor not performed in satisfaction of warranty is routinely posted in a place conspicuous to its service customer. A franchisor is not required to pay the price charged by the dealer to retail customers for parts of system, appliances, furnishings, accessories and fixtures of a motor home as defined in Title 29–A, section 101, subsection 40 that are designed, used and maintained primarily for nonvehicular residential purposes. Any claim made by a franchisee for compensation for parts provided or for reimbursement for labor performed in

satisfaction of a warranty must be paid within 30 days of its approval. All the claims must be either approved or disapproved within 30 days of their receipt. When any such claim is disapproved, the franchisee that submitted it must be notified in writing of its disapproval within that period, together with the specific reasons for its disapproval. No franchisor may, by agreement, by restriction upon reimbursement, or otherwise, restrict the nature or extent of labor performed or parts provided so that such restriction impairs the franchisee's ability to satisfy a warranty created by the franchisor by performing labor in a professional manner or by providing parts required in accordance with generally accepted standards.

In any claim that is disapproved by the manufacturer, and the dealer brings legal action to collect the disapproved claim and is successful in the action, the court shall award the dealer the cost of the action together with reasonable attorney fees. Reasonable attorney fees shall be determined by the value of the time reasonably expended by the attorney and not by the amount of the recovery on behalf of the dealer. [Paragraph 3 is omitted because it is not relevant to the certified questions as presented to the Law Court.]

3. This Court observes that the term "particularized claim" does not appear in section 1176; it is the term used by the parties and the District Court in this litigation.

4. This Court observes that the term "labor rate" does not appear in section 1176; it is the term used by the parties and the District Court in this litigation. The statute uses the language "retail rate customarily charged ... for the same labor when not performed in satisfaction of a warranty." 10 M.R.S.A. § 1176 (1997).

chisee posts the notice set forth in 29–A M.R.S.A. § 1805, has the dealer/franchisee thereby met the posting requirement of 10 M.R.S.A. § 1176 sufficiently to be able to recover its flat rate price in a warranty claim?

E.  (1) Does the language "retail rate customarily charged ... for the same parts" require a dealer/franchisee to provide a manufacturer with proof of a specific matching sale of the identical part?

(2) If yes, may a manufacturer demand that such a sale have taken place within the six months immediately prior to the making of the claim for reimbursement? If no, what proof can the manufacturer require?

F.  Are repairs performed by dealers under a manufacturer's recall, sublet or owner notification program covered by 10 M.R.S.A. § 1176?

[¶ 2]  We first note that our exercise of jurisdiction to answer the questions is proper.  No dispute exists as to the material facts at issue, no clear controlling precedents exist, and it appears that our answer would, in one alternative, be determinative of this case.  M.R.Civ.P. 76B(a); *Maine Green Party v. Secretary of State,* 1997 ME 175, ¶ 2, 698 A.2d 516, 517; *Johnson v. Allstate Ins. Co.,* 1997 ME 3, ¶ 5, 687 A.2d 642, 643–44.

[¶ 3]  The Amended Recapitulation of Previous Rulings and New Findings of Fact and Conclusions of Law accompanying the Certificate of Questions establishes the following facts.  Ford uses a network of nationwide franchise dealers, like Darling's, to sell the cars and trucks that it manufactures.  Ford uses a nationwide computerized system to reimburse Darling's for parts and labor utilized for warranty repairs.  That system does not take into account the actual amount that a dealer charges to nonwarranty customers for labor or parts.  In 1995, Darling's filed a complaint in Superior Court, which Ford removed to federal court, claiming that Ford's reimbursement policies did not meet the statutory requirements of 10 M.R.S.A. § 1176 (1997).  After conducting a hearing and issuing findings, the District Court certi-

fied the questions addressed individually below.

A.  *(1) Does 10 M.R.S.A. § 1176 require a dealer/franchisee to make a "particularized claim" to a manufacturer in seeking reimbursement for warranty work?*

*(2) If yes, does a formal demand letter specifying (a) the original computerized claim number; (b) the retail amount claimed; (c) the amount the dealer received under the nationalized system; (d) the nature of the claim (parts or labor); and (e) the difference between the amount received and the retail price, meet the "particularized claim" requirement?*

[¶ 4]  Ford argues that the statute requires Darling's to submit a "particularized claim" to Ford to be reimbursed under the statute.  Darling's responds that the statute does not explicitly require it to submit a "particularized" claim.  Alternatively, Darling's argues that the claim that it submitted satisfies any such statutory requirement.  Darling's claim is in the form of the formal demand letter described in A(2) above.

[¶ 5]  When interpreting a statute, we seek to give effect to the intent of the Legislature by examining the plain meaning of the statutory language and considering the language in the context of the whole statutory scheme.  *Estate of Whittier,* 681 A.2d 1, 2 (Me.1996); *Thibeault v. Larson,* 666 A.2d 112, 114 (Me.1995).  We avoid statutory constructions that create absurd, illogical or inconsistent results.  *Town of Madison, Dep't of Elec. Works v. Public Utils. Comm'n,* 682 A.2d 231, 234 (Me.1996).

[¶ 6]  Section 1176 directs the manufacturer to: (i) approve or disapprove a claim for warranty reimbursement within thirty days of receiving a claim; (ii) notify a dealer of a disapproved claim within the thirty day period by a writing that details the reasons for the disapproval; and (iii) pay an approved claim within thirty days of the approval date.  Accomplishing these objectives necessarily requires that a dealer submit a claim that is sufficiently individualized to enable a manufacturer to satisfy these obligations.  *See, e.g., Acadia Motors, Inc. v. Ford Motor Co.,* 844 F.Supp. 819, 828 (D.Me.1994), *aff'd in*

*part and remanded,* 44 F.3d 1050 (1st Cir. 1995) ("Ford is entitled to some notice informing it of the pertinent facts regarding the claim that would enable it to determine whether the claim should be approved or denied.").

[¶ 7] The District Court determined that Darling's fulfilled this requirement by submitting a claim that specified the original computerized claim number, the retail amount claimed, the amount the dealer received under the nationalized system, the nature of the claim, and the difference between the amount received and the retail price. This finding is sufficient to show that Darling's claim meets the statutory requirement for an individualized claim.

  B. *Does the term "labor rate" in the statute include pricing systems whereby the dealer/franchisee consults sources for the number of hours to assign and then multiplies that number by its hourly rate regardless of the amount of time actually spent and regardless of the amount of time the manufacturer/franchisor thinks is appropriate (so-called "flat rate" pricing)?*

[¶ 8] Ford argues that section 1176 prohibits flat rate pricing[5] and requires reimbursement based on the dealer's published hourly labor rate. Darling's contends that the statute requires reimbursement of the labor amount that a dealer would charge to a nonwarranty customer for the same job either at a flat rate or for actual time.

[¶ 9] Section 1176 provides in relevant part that a manufacturer reimburse a dealer at "the retail rate customarily charged by that franchisee for the same labor when not performed in satisfaction of a warranty; provided that the franchisee's rate for labor not

performed in satisfaction of a warranty is routinely posted in a place conspicuous to its service customer." 10 M.R.S.A. § 1176 (1997). The statutory language provides little guidance in resolving whether "retail rate" excludes flat rate pricing, thus, we consider the statute's legislative history and underlying policy. *Arsenault v. Crossman,* 1997 ME 92, ¶ 7, 696 A.2d 418, 421.

[¶ 10] Nothing in the legislative history supports exclusion of flat rate pricing. The Legislature introduced the term "retail rate" in an amendment to the statute, P.L.1979, ch. 698, § 1. This amendment reflected the Legislature's concern that manufacturers were using their superior bargaining power to reimburse dealers at artificially low prices for warranty repairs, thereby causing dealers to charge nonwarranty customers inflated repair prices. Final Report of the Joint Standing Committee on Business Legislation pursuant to H.P. 1459 1, 4 (Jan. 25, 1980) [hereinafter "Final Report"]; L.D. 1879 Statement of Fact 4 (109th Legis.1979). Neither the Committee Report nor the Statement of Fact indicate that the Legislature limited its concern about labor charges to hourly rates.

[¶ 11] The legislation that enacted the "retail rate" language of section 1176 also included a provision requiring a dealer to notify consumers about its labor pricing practices. P.L.1979, ch. 698, § 4, *codified as,* 29 M.R.S.A. 2605, *repealed by,* P.L.1993, ch. 683, § A–1 (effective date January 1, 1995) *and replaced by,* P.L.1993, ch. 683, § A–2, *codified as,* 29–A M.R.S.A. § 1805. The Legislature enacted section 1805 "to ensure that the dealer's rate is bona fide." Final Report, at 4. Section 1805 requires dealers to post a notice that specifies the hourly charge.[6]

---

5. "Flat rate" pricing, as used here, refers to when a dealer consults sources for the number of hours to assign and then multiplies that number by its hourly rate regardless of the amount of time actually spent and regardless of the amount of time the manufacturer thinks is appropriate.

6. 29–A M.R.S.A. § 1805 (1996 & Supp.1997) provides:
  **1. Form of notice.** A repair facility must post the following notice in a place where it is reasonably likely to be seen by customers. The notice must be completed with information on

charges and printed so that it is conspicuous and can be read by the average person. The following form must be used:
    "NOTICE TO OUR CUSTOMERS
    REQUIRED UNDER STATE LAW"
Before we begin making repairs, you have a right to put in writing the total amount you agree to pay for repairs. You will not have to pay anything over that amount unless you agree to it when we contact you later.
Before you pay your bill, you have a right to inspect any replaced parts. You have a right

Subsection 2 of section 1805 directs dealers to notify consumers when flat rate pricing is used and indicate that information about flat rate pricing is available upon request.

[¶ 12] Section 1805 supports the conclusion that "retail rate" does not exclude flat rate pricing, because it allows dealers to use flat rates, as long as they comply with its notification requirements. Subsequent amendments to section 1805 further support this conclusion. L.D. 1044, Statement of Fact (114th Legis.1989), *codified as,* 29 M.R.S.A. § 2605, *repealed by,* P.L.1993, ch. 683, § A–1 (effective date January 1, 1995) *and replaced by,* P.L.1993, ch. 683, § A–2, *codified as,* 29–A M.R.S.A. § 1805 ("The bill ensures that automobile repair customers understand all repair charges, including whether they are being charged an hourly labor rate or a flat rate."); P.L.1997, ch. 221, § 1 (118th Legis.1997) (requiring dealer to include the statement "please ask us whether we will charge you by the hour or by a flat rate" in its posted notice).

*C. Under 10 M.R.S.A. § 1174(1), can a dealer/franchisee use a published table of labor times even though those times are greater than what the manufacturer/franchisor concludes are reasonable for the repair transaction?*

■ [¶ 13] The statute does impose implicit limits on the rates that a dealer may charge. Section 1174(1) (1997) prohibits conduct which is "arbitrary, in bad faith or unconscionable." Since the statute does not define these terms, we examine the terms in the context of the statutory scheme of which it is a part to implement legislative intent. *Wheaton Van Lines, Inc. v. Gahagan,* 669 A.2d 745, 748 (Me.1996). Although the Legislature wanted to prevent nonwarranty cus-

tomers from paying inflated prices, it limited its concern to inflated prices resulting from manufacturers reimbursing dealers at artificially low rates and chose to allow competition in the market to establish the rate charged. L.D. 1879, Statement of Fact 4 (109th Legis.); Final Report, at 4–5.

[¶ 14] In the absence of evidence to the contrary, we conclude that the Legislature intended the generally accepted meanings of the terms to apply. In *Schott Motorcycle Supply, Inc. v. American Honda Motor Co., Inc.,* 976 F.2d 58, 63 (1st Cir.1992), "arbitrary, in bad faith, or unconscionable" was defined as follows:

"arbitrary" has been defined as "selected at random and without reason," and "unconscionable" as "shockingly unfair or unjust." Webster's New Collegiate Dictionary. *And although* the Maine statute does not define "bad faith," it does provide a definition of "good faith": "honesty in fact and the observation of reasonable commercial standards of fair dealing in the trade" as defined and interpreted in § 2–103(1)(b) of the U.C.C. A party presumably acts in bad faith when one of these two elements is missing.

[¶ 15] The District Court found that the Motor Times Manual that Darling's uses for pricing is not "arbitrary, in bad faith or unconscionable" according to the generally accepted meanings of these terms. This finding does not mean that Darling's may use the Motor Times Manual, unless the District Court also finds that the manual identifies the "retail rates customarily charged," as required by 10 M.R.S.A. § 1176 (1997). The term "customarily" means identifying the pricing practices that dealers generally use, which are consistent with "reasonable com-

---

to take with you any replaced parts, unless we are required to return the parts to our distributor or manufacturer.
We can not install any used or rebuilt parts unless you specifically agree in advance.
You cannot be charged any fee for exercising these rights.
"WE CHARGE $ PER HOUR FOR LABOR.
(We round off the time to the nearest .)"
**2. Flat rate.** The notice must also contain the following if it applies:
"We also charge a flat rate for some repairs. Our service manager will explain what a flat

rate is and show you how much it may cost you. A flat-rate charge may not match the time actually spent repairing your vehicle. PLEASE ASK U.S. WHETHER WE WILL CHARGE YOU BY THE HOUR OR BY A FLAT RATE."
**3. Availability of guide.** The notice must also contain the following:
"The current edition of the National Automobile Dealer's Association Official Used Car Guide New England Edition is available for your review upon request."

mercial standards of fair dealing in the trade." *Schott*, 976 F.2d at 63; *see also, e.g.,* 11 M.R.S.A. 1–205(3) (1995) ("A usage of trade is any practice or method of dealing having such regularity of observance in a place, vocation or trade as to justify an expectation that it will be observed with respect to the transaction in question.").

> *D. If flat rate labor pricing is permitted under the statute and if a dealer/franchisee posts the notice set forth in 29–A M.R.S.A. § 1805, has the dealer/franchisee thereby met the posting requirement of 10 M.R.S.A. § 1176 sufficiently to be able to recover its flat rate price in a warranty claim?*

[¶ 16] Section 1176 requires a manufacturer to reimburse a dealer for warranty labor at retail rates only if the dealer's non-warranty rate for labor is "routinely posted in a place conspicuous to its service customer." The District Court found that to comply with this requirement, Darling's posted the notice set forth in 29–A M.R.S.A. § 1805 (1997) and placed flat rate pricing information on a shelf below the statutorily mandated notice. The section 1805 notice requires a dealer to notify consumers that it uses flat rates, that they should ask the service manager to explain what a flat rate is, and that they should inquire when the dealer uses flat rates. 29–A M.R.S.A. § 1805 (1997). Ford argues that Darling's actions do not satisfy section 1176, because, Ford asserts, section 1176 requires Darling's to post on the wall every flat rate that it uses.

[¶ 17] Construing the definition of "post" as narrowly as Ford advocates would lead to an illogical result. *Fullerton v. Knox County Comm'rs*, 672 A.2d 592, 594 (Me.1996). A dealer may have so many flat rates that posting them on the wall would be cumbersome and confusing to consumers. Presuming that the District Court concludes that the underlying flat rates that Darling's uses comply with the statute, the District Court's findings about Darling's labor rate posting practices are sufficient to conclude that these practices satisfy the posting requirement of section 1176.

> *E. (1) Does the language "retail rate customarily charged ... for the same parts" require a dealer/franchisee to provide a manufacturer with proof of a specific matching sale of the identical part?*

[¶ 18] Ford argues that the statute allows it to require Darling's to provide proof of an actual sale of the same part at the claimed retail rate within the last six months before it reimburses Darling's. Section 1176 requires that a manufacturer "reimburse the franchisor for any parts so provided at the retail rate customarily charged by that franchisor for the same parts when not provided in satisfaction of a warranty." The statutory language does not require that a dealer prove it has made an actual sale of a specifically matching part, which might be impossible to prove with new vehicle parts. Instead, section 1176 requires a determination of the rate that a dealer would "customarily" charge a nonwarranty customer for a part. That determination can be accomplished without requiring proof of a nonwarranty sale, for example, by showing a practice of uniform markup or other pricing mechanism for all parts or for a similar part. If dealers have set similar prices for a part, those prices constitute the "retail rate customarily charged" for that part, even if it has not been sold yet.

> *(2) If yes, may a manufacturer demand that such a sale have taken place within the six months immediately prior to the making of the claim for reimbursement? If no, what proof can the manufacturer require?*

[¶ 19] The statute does not prohibit the manufacturer from imposing reasonable verification requirements on dealers or from imposing a time limit on submitting claims for reimbursement. Allowing manufacturers to impose reasonable verification requirements is consistent with the statute's legislative purpose to protect consumers, because it provides a mechanism to ensure that dealers submit claims for reimbursement at bona fide rates. The District Court found that Ford's six month time limit for claim submissions is a reasonable requirement. Section 1176, therefore, does not prohibit Ford from imposing this verification requirement.

*F. Are repairs performed by dealers under a manufacturer's recall, sublet or owner notification program covered by 10 M.R.S.A. § 1176?*

[¶ 20] Darling's argues that section 1176 covers sublet warranty repairs. Sublet repairs occur when the dealer must make a repair, but cannot provide the specialized labor or materials required to make the repair. In these situations, the dealers hires a subcontractor to make the repair. Darling's charges a twenty-five percent markup over its cost for the sublet work to its nonwarranty customers and wants Ford to reimburse it at this markup for subcontracted warranty work. Ford argues that the statute does not apply to sublet repairs.

[¶ 21] We determine that section 1176 includes reimbursement for sublet repairs. The statute governs reimbursement of all repairs in which a manufacturer "requires or permits a motor vehicle franchisee to perform labor or provide parts in satisfaction of a warranty...." 10 M.R.S.A. § 1176 (1997). Since section 1176 applies to all warranty repairs, it applies to warranty repairs accepted by dealers who lack the ability to make all repairs on their premises, as well as to dealers who have the ability to make all repairs on their premises.

[¶ 22] Darling's also argues that the statute requires Ford to reimburse it for service that it provides in connection with vehicle recalls. Ford requires Darling's to make vehicle recall repairs. The statute requires reimbursement for parts and labor provided "in satisfaction of a warranty created by the franchisor." 10 M.R.S.A. § 1176 (1997). The statute covers vehicle recalls because they arise from an implied warranty of merchantability that Ford creates by selling the vehicles and then requiring Darling's to provide parts and labor in connection with that implied warranty.

[¶ 23] Finally, Darling's argues that the statute requires Ford to reimburse it for service that it provides in connection with Ford's owner notification program. The statute requires reimbursement for parts and labor provided "in satisfaction of a warranty created by the franchisor." 10 M.R.S.A. § 1176. The statute covers repairs made in connection with owner notification programs because Ford extends its warranty to correct vehicle defects through owner notification programs and then requires Darling's to make the repairs covered by them.

The entry is:

We answer the certified questions as indicated in this opinion.