2002 ME 21

## ESTATE OF Murray KEATINGE

v.

## Elizabeth E. BIDDLE et al [1]

Supreme Judicial Court of Maine.

Argued: Oct. 9, 2001.

Decided: Feb. 8, 2002.

---

**1.** Strout & Payson, P.A. is also a listed defendant.

Lee H. Bals, Esq. (orally), Regan M. Hornney, Esq., Marcus, Clegg & Mistretta, P.A., Portland, for plaintiff.

2. 4 M.R.S.A. § 57 (Supp.2000) provides, in relevant part:

> When it appears to the Supreme Court of the United States, or to any court of appeals or district court of the United States, that there is involved in any proceeding before it one or more questions of law of this State, which may be determinative of the cause, and there are no clear controlling precedents in the decisions of the Supreme Judi-

James M. Bowie, Esq. (orally), Elizabeth Knox Peck, Esq., Thompson & Bowie, Portland, for defendants.

Panel: SAUFLEY, C.J., and CLIFFORD, RUDMAN, ALEXANDER, and CALKINS, JJ.

ALEXANDER, J.

[¶ 1] The United States District Court for the District of Maine (*Hornby, C.J.*), acting pursuant to 4 M.R.S.A. § 57 (Supp. 2000) and M.R.App. P. 25 [2] (formerly M.R. Civ. P. 76B), has certified the following questions:

A. When the *holder* of a power of attorney engages a lawyer to perform legal services such as those relating to a sale of property owned by the *grantor* of the power, or legal services related to the *grantor's* commercial businesses, can the engagement ever result in an attorney-client relationship between the hired lawyer and the *grantor* of the power?

B. If yes, is there any change in the proof necessary to demonstrate the existence of such an attorney-client relationship? Specifically, in *Board of Overseers of the Bar v. Mangan*, 763 A.2d 1189 (Me.2001), the Law Court adopted the formulation

> that an attorney-client relationship is created when (1) a person seeks advice or assistance from an attorney, (2) the advice or assistance sought pertains to matters within

cial Court, such federal court may certify any such questions of law of this State to the Supreme Judicial Court for instructions concerning such questions of state law, which certificate the Supreme Judicial Court sitting as the Law Court may, by written opinion, answer.

Rule of Appellate Procedure 25 provides the procedural requirements for certification.

the attorney's professional competence, and (3) the attorney expressly or impliedly agrees to give or actually gives the desired advice or assistance.

*Id.* at 1192–93 (citations and quotation marks omitted). When the *holder* of the power engages the lawyer, is it appropriate to modify the first of the three requirements so as not to require the grantor *personally* to seek the advice or assistance, but rather to require that the lawyer be asked for advice or assistance "on behalf of the grantor"?

C. With respect to the third requirement taken from *Mangan* ("the attorney expressly or impliedly agrees to give or actually gives the desired advice or assistance"), is the Law Court disposed to adopt the RESTATEMENT (THIRD) OF THE LAW GOVERNING LAWYERS § 14(1)(b) (1998) alternative formulation that it is sufficient on that element if the lawyers failed to manifest lack of consent to provide legal services when they knew or reasonably should have known that the grantor reasonably relied on them to provide the services?

[¶ 2] In the exercise of our jurisdiction over the questions certified, *see Darling's v. Ford Motor Co.*, 1998 ME 232, ¶ 2, 719 A.2d 111, 114, we answer question (A) in the affirmative. We do not answer questions (B) and (C), however, because we find the situation presented in *Mangan* to be dissimilar to the case before us.

## I.  FACTUAL BACKGROUND

[¶ 3] The factual and procedural history, as certified by the District Court and indicated in the record, is as follows:

[¶ 4] In November 1997, Kent Keatinge engaged Elizabeth Biddle, an attorney employed by Strout & Payson, P.A., to draft a power of attorney to give Kent authority to act for his father, Murray Keatinge, who had undergone bypass surgery and was seriously ill. That power of attorney was drafted by Biddle and signed by Murray Keatinge. It was replaced in March 1998 by a durable power of attorney, drafted by another attorney and signed by Murray Keatinge. The new power of attorney also gave Kent, the designated "Agent" or "Attorney–in–Fact," authority to act for Murray, the designated "Principal." [3]

[¶ 5] In 1998, pursuant to the power of attorney, Kent directed Biddle and her firm to perform title work to secure a line of credit for the Norumbega Bed & Breakfast, one of Murray's businesses. Biddle also performed other work relating to the Norumbega at Kent's direction, including giving legal advice to its manager regard-

---

**3.** The durable power of attorney provided that Murray (called the "Principal") granted to Kent (called the "Agent") the authority "to make decisions about [his] money and property and to use it on [his] behalf." The durable power of attorney bestowed upon Kent, the "Agent" and "Attorney–in–Fact," authority over various aspects of Murray Keatinge's life, both business and personal. For example, the power of attorney granted Kent the following authority: (1) to expend income and principal for Murray's support, care, or benefit; (2) to "open and close bank accounts, to endorse checks for deposit, to write checks or

to make withdrawals;" (3) to "sign, execute, acknowledge and deliver on [Murray's] behalf any deed of transfer or conveyance" with respect to Murray's interest in any personal or real property; (4) to sell, exchange, assign or transfer any shares of stock held in Murray Keatinge's name; (5) to "conduct, engage in, and transact any and all lawful business of whatever nature or kind" on behalf of Murray; and (6) to "create, declare or otherwise establish revocable or irrevocable trusts for [Murray's] benefit or for the benefit of such relatives, friends and charities as would likely be the recipients of donation from [him]."

ing its operation and formation of a corporate operating entity.

[¶ 6] During the summer of 1998, also pursuant to the power, Kent directed Biddle and her firm to provide legal services to effectuate the sale of Greyrocks, a parcel of property to which Murray Keatinge held title. Biddle sent Murray documents for his signature during the course of this transaction. Also, during the course of the transaction, and acting on information given her by Kent Keatinge, Biddle wrote a letter to Gardiner Savings Institution, which held cross-collateralized mortgages on Greyrocks and the Norumbega, stating that Murray Keatinge had agreed to invest some of the proceeds of the Greyrocks sale in the Norumbega. She stated that Murray needed some of the proceeds to support his retirement and to pay the capital gains tax on the sale.

[¶ 7] Prior to the closing on Greyrocks, Biddle received Kent Keatinge's authorization to sign in his place as holder of the power of attorney. Accordingly, at the closing, Biddle signed the settlement statement twice, once as "Murray Keatinge by Elizabeth E. Biddle, his Attorney–in–Fact," and the second time as "Murray Keatinge by Elizabeth E. Biddle, Esq., his Atty–in–Fact." Out of the sale proceeds, Biddle and her firm were paid approximately $6000 in fees for work associated with the closing. Although Murray had concerns about the bill and in a telephone call asked Biddle to itemize it, she never did.

[¶ 8] Murray Keatinge understood that Kent would handle his business affairs through the power of attorney. He also understood that Strout & Payson was handling legal issues for the sale of Greyrocks. Through September 1998, the only direct contact between Murray and Biddle was the correspondence regarding the Greyrocks closing and the telephone call regarding the bill.

[¶ 9] One month after the closing, Biddle and her firm brought suit against Murray Keatinge on behalf of Kent Keatinge. The subject of the suit was Murray's alleged failure to fund a trust for Kent's benefit. Murray Keatinge cross-claimed, alleging that Kent had dealt improperly with Murray's property. In a judicially approved settlement in 1998, the Keatinges agreed on various property transfers and released all claims against one another.

[¶ 10] Murray Keatinge then brought a lawsuit against Biddle and Strout & Payson, alleging that he had an attorney-client relationship with the defendants that they breached by suing him. Murray Keatinge died during the proceedings and the executrix of his estate, Cecelia Cole, was substituted in his place. The jury returned a verdict in favor of the estate, awarding $660,000 in damages.

## II. DISCUSSION

■ [¶ 11] A durable power of attorney is defined as a "power of attorney by which a principal designates another as the principal's attorney-in-fact" in a writing that evinces the principal's intent that the authority conferred upon the attorney-in-fact is "exercisable notwithstanding the principal's subsequent disability or incapacity, and unless it states a time of termination, notwithstanding the lapse of time since the execution of the instrument." 18–A M.R.S.A. § 5–501(a) (1998). In essence, an attorney-in-fact is the alter ego of the principal.

[¶ 12] The Maine Probate Code provides that acts taken by the attorney-in-fact pursuant to the power of attorney while the grantor is disabled or incapacitated "have the same effect and inure to the benefit of and bind the principal and the principal's successors in interest as if the principal were competent and not disabled." *Id.* § 5–502 (1998). As an attorney-in-fact, all

health care and financial decisions are to be made "on the principal's behalf." *See id.* §§ 5–506, 5–508 (1998 & Supp.2001).[4] The holder of a durable power of attorney, as the agent, is not entitled to use the grantor's money for his own benefit or to make gifts to himself unless the written power of attorney specifically provides. *Id.* § 5–508(d).

[¶ 13] This case reaches us at an unusual point in the process. The question is not posed in a context in which our answer could give guidance on how to instruct the jury on the law. The case has been tried, the jury has been instructed, a verdict has been reached. The first question to us is framed in terms of whether an attorney-client relationship can *ever* be created between the attorney and the grantor of a power of attorney.

■ [¶ 14] We have held that an attorney-client relationship arises when "(1) a person seeks advice or assistance from an attorney, (2) the advice or assistance sought pertains to matters within the attorney's professional competence, and (3) the attorney expressly or impliedly agrees to give or actually gives the desired advice or assistance." *Board of Overseers of the Bar v. Mangan*, 2001 ME 7, ¶ 9, 763 A.2d 1189, 1192–93 (quoting *State v. Gordon*, 141 N.H. 703, 692 A.2d 505, 506 (1997)). In ordinary circumstances, when the holder of a power of attorney retains counsel to assist him in fulfilling his duties, the lawyer has an attorney-client relationship with

the holder only. In order to effectively exercise the powers granted to him, the holder of the power of attorney may often need to retain counsel. For example, the holder of a power of attorney is not authorized to appear pro se on behalf of the grantor. *See Haynes v. Jackson*, 2000 ME 11, ¶¶ 13–14, 744 A.2d 1050, 1053–54.

■ [¶ 15] Thus, the mere retention of counsel by the holder does not by itself create an attorney-client relationship between the attorney and the grantor.[5] There must be some other agreement or arrangement to create the separate attorney-client relationship between the attorney and the grantor. To hold otherwise would leave the attorney hired to represent the holder of a power of attorney in the untenable position of being subject to ill-defined professional responsibilities and create the reality of conflicting loyalties.

■ [¶ 16] Due to the potential for conflicting loyalties, additional facts beyond the mere granting of a power of attorney are required to support the creation of an attorney-client relationship between the grantor and counsel retained by the holder. Other courts that have found an attorney-client relationship to exist between the attorney and the grantor of a power of attorney have not adopted a per se rule, but rather have examined the particular facts establishing the relationship. *See, e.g., Simon v. Wilson*, 291 Ill.App.3d 495, 225 Ill.Dec. 800, 684 N.E.2d 791, 801 (1997)

---

4. 18–A M.R.S.A. § 5–506(a) (1998) provides, in pertinent part: "A durable health care power of attorney is a durable power of attorney by which a principal designates another as attorney-in-fact to make decisions *on the principal's behalf* in matters concerning the principal's medical or health treatment and care." (Emphasis added).

   18–A M.R.S.A. § 5–508(a) (Supp.2001) provides, in pertinent part: "A durable financial power of attorney is a durable power of attorney by which a principal designates another

ney as attorney-in-fact to make decisions *on the principal's behalf* in matters concerning the principal's finances, property or both." (Emphasis added).

5. The situation here is distinct from the corporate setting, in which the corporate entity peculiarly cannot hire an attorney on its own. Specific guidelines have been developed to assist attorneys in such situations. *See* RESTATEMENT (THIRD) OF LAW GOVERNING LAWYERS § 96 (1998).

(holding an attorney-client relationship was established between the attorney and the grantor of a power of attorney because the power of attorney was granted for the specific purpose of estate planning and the attorney prepared a will for the grantor); *Albright v. Burns,* 206 N.J.Super. 625, 503 A.2d 386, 389 (App.Div.1986) (finding an attorney-client relationship between the attorney and the grantor of a power of attorney where the attorney was aware of the conflict and potential harm but nonetheless accepted the proceeds of a stock sale and prepared a promissory note). Further, agency law principles do not compel the finding of an attorney-client relationship between the grantor of a power of attorney and the attorney retained by the holder. *Sun Studs, Inc. v. Applied Theory Assoc. Inc.,* 772 F.2d 1557, 1568 (Fed.Cir. 1985) (citing RESTATEMENT (SECOND) OF AGENCY § 14H (1958)).

[¶ 17] We have recognized the possibility of conflicting loyalties in analogous contexts. In determining who has standing to bring a malpractice action against an attorney, we held that individual beneficiaries could not bring a malpractice claim against a lawyer who prepared estate planning documents when there was a personal representative for the estate. *Nevin v. Union Trust Co.,* 1999 ME 47, ¶ 41, 726 A.2d 694, 701. We observed that creating a duty to the beneficiaries as well as the estate itself "could significantly add to the difficulty and cost of preparing estate planning documents and obtaining competent counsel to draft documents when there is a significant possibility of conflict among beneficiaries." *Id.* Similar difficulties could confront an attorney hired by an attorney-in-fact if she were bound by competing loyalties.

[¶ 18] Other courts have also emphasized the potential for conflicting loyalties in determining that no duty is owed by an attorney to beneficiaries of a trust or es-tate. *See Neal v. Baker,* 194 Ill.App.3d 485, 141 Ill.Dec. 517, 551 N.E.2d 704, 706 (1990); *Ferguson v. Cramer,* 349 Md. 760, 709 A.2d 1279, 1286 (1998); *Spinner v. Nutt,* 417 Mass. 549, 631 N.E.2d 542, 547 (1994). In applying the fiduciary principles of trust law to a durable power of attorney, a Delaware court observed that "[t]he common law fiduciary relationship created by a durable power of attorney is regarded as similar to the relationship created by a trust." *Williams v. Spanagel,* No. 14488, 2000 WL 1336728, at *4 (Del. Ch. May 2, 1999) (citing *Schock v. Nash,* 732 A.2d 217, 224–25 (Del.1999)).

[¶ 19] Thus, the mere fact that the person holding the power of attorney retains counsel does not create an attorney-client relationship between the attorney and the grantor. However, the question presented is whether an attorney-client relationship between the attorney and grantor can *ever* arise. That question we must answer in the affirmative, because facts may develop in particular cases that could support a finding that such an attorney-client relationship between attorney and grantor has been created.

The entry is:

We answer question (A) in the affirmative.

We do not answer questions (B) and (C).