# United States Court of Appeals
## For the First Circuit

No. 02-1317


ESTATE OF MURRAY KEATINGE, CECELIA COLE as Executrix,

Plaintiff, Appellee,

v.

ELIZABETH H. BIDDLE, STROUT & PAYSON, P.A.,

Defendants, Appellants.


APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MAINE
[Hon. D. Brock Hornby, U.S. Chief District Judge]


Before

Boudin, Chief Judge,
Torruella and Lynch, Circuit Judges.


James M. Bowie with whom Robert C. Hatch and Thompson &
Bowie, LLP were on brief, for appellants.
Lee H. Bals with whom Marcus, Clegg & Mistretta, P.A. was
on brief, for appellee.


November 1, 2002

**LYNCH**, **Circuit Judge**.    A federal jury in Maine found that a lawyer and her law firm had simultaneously represented Murray Keatinge and another person with interests adverse to Murray (his son Kent) and then compounded the problem by suing Murray on behalf of Kent.  For this breach of an attorney's duty of loyalty and care, the jury awarded damages of $660,000.  The defense of attorney Elizabeth Biddle and the firm of Strout & Payson was that they had never represented Murray Keatinge; rather, they had only represented Kent: they had represented Kent in the exercise of the power of attorney granted by Murray, in both the sale of Murray's house and the management of Murray's business.  Defendants contended that an attorney's representation of the holder of a power of attorney can never establish an attorney-client relationship with the grantor of that power.

The Maine Law Court, in an answer to a question certified after the jury rendered this verdict, disposed of that contention by holding that the issue of the existence of an attorney-client relationship is one of fact.  There is no rule in Maine that an attorney in such a position is never in an attorney-client relationship with the grantor of the power and no rule that such an attorney is always in an attorney-client relationship.  Estate of Keatinge v. Biddle, 789 A.2d 1271, 1276 (Me. 2002).

On appeal the defendants now argue that the trial court's earlier jury instruction, given without the benefit of the Law

-2-

Court's later opinion, was potentially misleading to the jury.  We too have concerns about the instruction.  But that gives the defendants no remedy: they failed to preserve the issue as required by Fed. R. Civ. P. 51, they do not meet the plain error criteria, and we do not think a corrected jury instruction would have changed the outcome.  Defendants also argue that they were entitled to certain jury instructions which they did request but which were not given.  The instructions requested would not have been appropriate on the facts of this case and were quite properly rejected.  We affirm.

I.

We take the facts in the light most favorable to the verdict, save for a neutral recitation of whether the plaintiff's evidence warranted the instructions requested.  See Gray v. Genlyte Group, Inc., 289 F.3d 128, 131 (1st Cir. 2002) (evidence offered by either side may be pertinent to assessing the appropriateness of jury instructions).

The story of this ill-fated triangle -- father, son, and lawyer -- reaches back in time.  Murray Keatinge and Elisabeth Keatinge married and had a son, Kent.  During the marriage they acquired a house, Greyrocks, in Camden, Maine in 1985.  Two days before she died in 1990, Elisabeth made a will, naming her husband executor, and created the Keatinge Revocable Trust with her husband.  On her death, her half interest in Greyrocks poured into

the Revocable Trust.  In turn, in 1996, Murray transferred Elisabeth's interest in Greyrocks to a Marital Trust of which he was Trustee.  The Marital Trust, of which Murray was the sole beneficiary, was set up under the Revocable Trust.  There was also another trust under the Revocable Trust: the Family Trust, whose sole beneficiary was Kent.  Under the terms of the Revocable Trust, Murray, as Trustee, was obligated to fund the Family Trust in the amount of $600,000 within six months of the death of the first of the grantors of the Revocable Trust (i.e., Elisabeth).  He did not do so.

It is undisputed that Murray owned at least half of Greyrocks.  In any event, Greyrocks was held by Murray both individually and as Trustee of the Revocable Trust (Marital Trust).  The jury could have concluded that Murray was the sole owner of Greyrocks.

Murray also had a business, the Norumbega Bed and Breakfast (B&B).  As of at least early 1998, half of the record title was held by Murray personally and half was held by the Revocable Trust (Marital Trust).[1]  Before late 1997, Kent had been involved in the management of the B&B.

In August 1997, Biddle brought an action in the Maine Probate Court seeking to put Murray and his assets into a

_____

[1]Biddle later took the position that Kent also had an ownership interest in the B&B.

-4-

guardianship and conservatorship. Biddle had been retained to do so by Kent, who said he was concerned about the oversight of his father's health care and businesses after his father had multiple by-pass surgery. Kent was appointed temporary guardian and conservator September 3, 1997. During that proceeding, Biddle necessarily familiarized herself with Murray's assets. The purpose of the conservatorship was to protect the estate and assets of the allegedly incapacitated person, here Murray, as well as to protect Kent's interest in his mother's estate, administered by Murray. Me. Rev. Stat. Ann. tit. 18-A, § 5-401 (2001). Murray, represented by different counsel, opposed Kent's petition for conservatorship on September 12, 1997. Murray said he opposed appointment of either a guardian or conservator and that even if there were an emergency, he had given Cecelia Cole a health care power of attorney and his businesses were run by competent managers. He also said that Kent had a conflict of interest which would render him inappropriate to be guardian or conservator and that Kent's temporary appointment should be terminated. Indeed, Kent, represented by Attorney Clark Byam (not at Strout & Payson), had just threatened to sue to remove Murray as a trustee of a family trust. In the fall of 1997, Kent had Biddle withdraw the petition after a resolution was apparently worked out by agreement. On November 29, 1997, apparently as part of the agreement, Murray appointed Kent to be a co-trustee of the Revocable Trust. Biddle

-5-

also asked that her firm's fees for the work done on the conservatorship be paid out of Murray's estate.[2]

Pursuant to the resolution of the probate matter, Biddle prepared a power of attorney for Murray to execute, authorizing Kent to exercise certain powers. This work apparently was also part of the fee application. Murray executed the durable power of attorney on November 28, 1997. It gave Kent full power and authority to conduct Murray's business and affairs. Included among these was the power to borrow money, which Kent ultimately did employ. Kent's authority under the power of attorney went beyond the powers he had previously held while helping to manage the B&B. There are limits to a durable power of attorney. The holder is not entitled to use the grantor's money or property for his own benefit or to make gifts to himself or others unless the power of attorney so specifies. Id. § 5-508(b). This power of attorney did not give Kent such authority.

That power of attorney was replaced on March 10, 1998 by a new durable power of attorney drafted by another lawyer. Though broadly consistent with the old power of attorney, the new document provided much more detail regarding the scope of Kent's authority. It specifically empowered Kent to use his father's income and principal for Murray's support and to conduct Murray's estate

---

[2]Biddle also asked for a reduction in the fees for counsel hired by Murray.

planning (in conformance with his father's wishes). At the same time, it specifically forbade Kent from making transfers to himself not necessary for his health, education, support, or maintenance; receiving compensation for services rendered under the power of attorney; or disregarding certain provisions of any living will or related document Murray executed. Murray also executed a simple will on March 10, 1998.

Kent called Murray's lawyer, James Elliott, who had drafted the new durable power of attorney and will and asked him to send both documents to Biddle. On March 17, 1998, Elliott sent them to Biddle with a cover letter saying that Murray wished only to have a simple will in effect while he gave thought to a more extensive estate plan. Elliot also wrote that he assumed Biddle would handle any further estate planning for Murray and that she should advise him if that was not the case. Biddle did not reply other than to acknowledge receipt. She did retain the originals of the second durable power of attorney and the will in her files.

Using the first power of attorney, Kent retained Biddle to do work regarding the B&B and Greyrocks. That work was done from November 1997 to September 1998. In March 1998, Biddle analyzed the financial situation of the B&B in order to secure a line of credit for it from the Gardner Savings Institution. The equity line of credit was to be secured by a third mortgage on both the B&B and Greyrocks. Biddle worked on this project with James

Ayers, an accountant whom Kent had hired in his capacity as holder of the power of attorney, to do work for the B&B. It can be inferred that from the bank's point of view, Biddle's work on the B&B was being performed for Murray, and not for Kent in his own capacity. In early 1998 Biddle also handled two employment questions and a liquor license issue for the B&B.

On May 11, the issue of the $600,000 meant to be put into the Family Trust for Kent's benefit was apparently addressed when Biddle proposed, by letter to Murray's lawyer, that the Revocable Trust execute a note and mortgage to the Family Trust for $600,000 secured by a mortgage on Greyrocks and the B&B. The letter said she was acting for Kent Keatinge and asked that Murray execute the note, mortgage, and an affidavit that he was represented by separate counsel. Murray did so and his lawyer returned the documents on June 1, 1998. Murray's lawyer had earlier expressed to Biddle his concerns about the facts that Kent had been appointed co-trustee while the conservatorship for Murray was pending and that Biddle had unofficially raised doubts about the Marital Trust.

In July 1998 Biddle restructured the B&B to transfer its ownership into a new subchapter S corporation, E.B. Hammond, which she had incorporated. Both Murray and Kent appear to have been shareholders of E.B. Hammond. It also appears that Biddle structured matters so that Murray owned half of E.B. Hammond in one of his capacities and Kent, in some capacity, owned the other half.

One of Murray's theories in the case was that this restructuring was not necessary for the management of the B&B and was done in order to take away Murray's ownership interest. It was Biddle's intent that Murray would transfer his ownership interest in the B&B to E.B. Hammond and that E.B. Hammond would own the B&B.

Indeed, in an August 13, 1998 memorandum, Biddle concluded that all of Elisabeth Keatinge's estate should have gone to the Family Trust and none to the Marital Trust. She also concluded that the transfer of Elisabeth's half interest to the Marital Trust was invalid. These conclusions were obviously contrary to Murray's interests. Based on these conclusions, she named Murray and the three trusts as the grantors of Greyrocks in the Warranty Deed. She did not call to Murray's attention the issue on which there was conflict.

The bulk of plaintiff's complaint dealt with Biddle's handling of the sale of Greyrocks. Greyrocks and Norumbega were cross-collateralized through Gardner Savings Institution.[3] Biddle had represented to the Bank that Murray would invest $110,000 of the proceeds from Greyrocks in the B&B. Biddle also told the Bank that "Murray and Kent" are entitled to these proceeds from the sale of Greyrocks in equal shares, but did not copy Murray on the letter. A jury could find that Murray had not authorized that

---

[3]Biddle did send a letter to the Bank saying she was appearing only on behalf of Kent Keatinge.

representation or the transfer of the $110,000 from the Greyrocks proceeds. Biddle also represented to the Bank that Murray needed some of the proceeds to pay for his retirement and capital gains taxes.

There is no dispute that Murray owned at least half of Greyrocks outright at the time of the sale. Indeed, at the September 1, 1998 closing, Biddle signed in the space for the seller's signature as follows: "Elizabeth Biddle, attorney-in-fact for Murray Keatinge." She communicated with Murray both before and after the sale. Before the sale she sent him documents for him to sign and return to her. He did so. After the sale, Biddle spoke with Murray about the bill -- he questioned her over the telephone about the closing statement and its legal fees and the accounting statement. Murray asked for an itemized statement; Biddle never sent one. This was the only direct contact between Biddle and Murray.

There was reason for Murray to be concerned about the bill. Biddle had taken $14,680 from the closing proceeds for her legal fees. But no more than $6,800 of the legal fees were attributable to the closing. The discrepancy is not explained by work done for the B&B; that was billed separately. The bill did include fees for work directly against Murray's interests: that is, work for legal research on whether Murray had adequately funded

a trust established for Kent's benefit, work going back to March 1998.

The conflict of interests between Kent and Murray was made explicit by Biddle in a September 29, 1998 letter to Murray, after the closing. The letter said that Biddle had represented Kent since the guardianship proceedings the prior summer and that through this work and the sale of Greyrocks Biddle had become familiar with Murray and Elisabeth's estate planning. Murray, Biddle wrote, had deprived Kent of the benefits he should have received and Kent wanted to resolve the outstanding financial issues between the two of them.

Biddle, representing Kent, sued Murray in October 1998 in Superior Court in Maine on claims that Murray had failed as trustee to adequately fund a trust established for Kent's benefit. Biddle used information against Murray which she had obtained in the course of the prior representation.

That lawsuit was settled. As part of the settlement, Murray gave up his ownership in E.B. Hammond, which owned the B&B; some of Murray's other property was transferred to Kent; Murray assumed any tax liability from the sale of Greyrocks; and Murray and Kent executed a mutual release. The lawsuit was apparently, for Murray, the last straw which led to the federal litigation. The costs of that settlement and the attorneys fees paid to defend

himself became a major component of Murray's damages claim in the federal litigation.

## II.

Murray brought the federal litigation on October 19, 1999, under the court's diversity jurisdiction. Discovery was completed, including Murray's deposition, when Murray died on August 1, 2000. His estate subsequently became the plaintiff.

The complaint based its legal malpractice claim on allegations that Biddle did not disclose to Murray her conflict of interest; diverted for nefarious reasons proceeds from the Greyrocks closing; and failed adequately to represent Murray's interests.[4] Ultimately, the jury would be instructed that if an

---

[4] Specifically, plaintiff made the following allegations: (1) that Biddle failed to disclose to Murray that she should not represent his interests during the sale of Greyrocks since she was simultaneously advising Kent as to claims he might have against Murray for Murray's performance of his duties as a trustee under the Revocable Trust; (2) that without Murray's consent Biddle prepared a proposed deed and real estate tax transfer declaration which included as grantors entities which had no ownership interest in Greyrocks; (3) that Biddle escrowed $329,969.17 with the Gardner Savings Institution without authority from Murray, and provided for the account to be equally divided between Murray Keatinge and the Keatinge Family Trust (of which Kent was a beneficiary); (4) that Biddle permitted some of the escrow amounts to be paid to people other than Murray; (5) that this diversion of the proceeds from Greyrock was done for nefarious reasons -- diverting monies to Kent, depriving Murray of sums he would need to defend himself against the lawsuit that Kent was about to bring, and increasing their own legal fees in that litigation; (6) that Biddle misdirected some $10,000 of the closing proceeds to pay for work done by accountants that was unrelated to the Greyrocks sale and that was for Kent's benefit, adverse to Murray's interests; (7) that Murray had never agreed to invest $110,000 from Greyrocks in the B&B and he could not recover that sum; and (8) that Biddle

-12-

attorney-client relationship existed between Murray and Biddle, then there was a breach of Biddle's duties to Murray. There is no question that there was a breach of the duty of loyalty and due care if an attorney-client relationship existed between Murray and Biddle. There is also no claim about damages in this appeal.

The trial took four days. After deliberations, the jury returned a verdict finding that the defendants were in breach of their duties to Murray and that the breach had caused Murray $660,000 in total damages. The jury also found that Murray had not negligently caused his damages.

After the verdict, on a motion by defendants, the federal district court certified questions to the Maine Law Court.[5] The

failed to adequately represent Murray against Kent's contrary interests.

[5]The judge certified the following three questions to the Maine Law Court:
> A. When the <u>holder</u> of a power of attorney hires a lawyer concerning matters within the scope of the power, can the engagement ever result in an attorney-client relationship between the hired lawyer and the <u>grantor</u> of the power?
> B. If yes, is there any change in the proof necessary to demonstrate the existence of such an attorney-client relationship? Specifically, in <u>Board of Overseers of the Bar</u> v. <u>Mangan</u>, 763 A.2d 1189 (Me. 2001), the Law Court adopted the formulation
> > that an attorney-client relationship is created when (1) a person seeks advice or assistance from an attorney, (2) the advice or assistance sought pertains to matters within the attorney's professional competence, and (3) the attorney

Law Court replied:

> In ordinary circumstances, when the holder of a power of attorney retains counsel to assist him in fulfilling his duties, the lawyer has an attorney-client relationship with the holder only.  In order to effectively exercise the powers granted to him, the holder of a power of attorney may often need to retain counsel. For example, the holder of a power of attorney is not authorized to appear pro se on behalf of the grantor.
>
> Thus, the mere retention of counsel by the holder does not by itself create an attorney-client relationship between the attorney and the grantor.  There must be some other agreement or arrangement to create the separate attorney-client relationship between the attorney and the grantor.  To hold otherwise would leave the attorney hired to represent the holder of a power of attorney in the untenable position of being subject to ill-defined professional responsibilities and create the reality of conflicting loyalties.

Estate of Keatinge, 789 A.2d at 1275 (internal citations omitted).

The district court then rejected the motion for a new trial and for judgment as a matter of law, holding:

---

> expressly or impliedly agrees to give or actually gives the desired advice or assistance.
> Id. at 1192-93 (citations and quotation marks omitted). When the holder of the power engages the lawyer, is it appropriate to modify the first of the three requirements so as not to require the grantor personally to seek the advice or assistance, but rather to require that the lawyer be asked for advice or assistance "on behalf of the grantor"?
>     C.  With respect to the third requirement taken from Mangan, is the Law Court disposed to adopt the Restatement (Third) of the Law Governing Lawyers § 14(1)(b) (1998) alternative formulation that it is sufficient on that element if the lawyers failed to manifest lack of consent to provide legal services when they knew or reasonably should have known that the grantor reasonably relied on them to provide the services.

-14-

I instructed the jury that they could find an attorney-client relationship only if they found, among other things, that the lawyer(s) "knew or should have known that Murray Keatinge was relying upon them for legal counsel." On the evidence, the jury did not have to reach that conclusion, but it certainly could. Among other things, Murray Keatinge had talked directly to Attorney Biddle about the size of her bill, and Attorney Biddle had direct correspondence with him in connection with a real estate closing.

Keatinge v. Biddle, 188 F. Supp. 2d 3, 4 (D. Me. 2002) (order).

III.

Because this appeal focuses on the jury instructions given, we initially describe them and the colloquy and objections made. The court instructed:

On the question whether Murray Keatinge had an attorney/client relationship with the lawyers, the plaintiff Cecelia Cole bears the burden of proof. To proceed, she must show each of the following three things by a preponderance of the evidence:

(a) That the lawyers were asked for advice or assistance on behalf of Murray Keatinge;

(b) That the advice or assistance related to legal matters;

(c) That the lawyers expressly or impliedly agreed to give the desired advice or assistance on behalf of Murray Keatinge, or failed to demonstrate that they did not agree when they knew or reasonably should have known that Murray Keatinge reasonably relied on them to provide the services. That is, Cecelia Cole must show that Elizabeth Biddle and/or Strout & Payson knew or should have known that Murray Keatinge was relying upon them for legal counsel.

You should consider all the facts and circumstances. An attorney/client relationship may be created expressly, or it may be implied from the conduct of the parties.

-15-

This was a reworking of the standard set by Board of Overseers of the Bar v. Mangan, 763 A.2d 1189 (Me. 2001).

Though neither party contested the relevance of the Mangan standard, both parties objected to the court's jury instructions. The plaintiff objected that the court should have delivered proposed jury instructions providing, first, that an attorney retained by a guardian or conservator owes a fiduciary duty to the ward as well as to the guardian and, second, that counsel to the holder of a power of attorney represents and owes a duty of care to the grantor of the power of attorney (as well as to the holder). The defendants objected that the court had effectively instructed the jury that the holder's counsel always has a relationship with the grantor -- when, in fact, it should have instructed the jury that holder's counsel never has an attorney-client relationship with the grantor.

A. The "On Behalf Of" Instruction

The defendants argue that the jury instruction as given: (1) permitted the jury to find that an attorney asked to provide representation to a holder of a power of attorney would, by that fact, create an attorney-client relationship, because by definition the holder is usually acting for the benefit of the grantor of the power of attorney; and (2) did not tell the jury that mere

retention of counsel by the holder does not by itself create an attorney-client relationship with the grantor. This, they say, contravenes the Law Court's holding that the mere retention of counsel by the holder does not by itself create an attorney-client relationship. Estate of Keatinge, 789 A.2d at 1275-76. We agree that the instruction given had some potential to be misleading on certain facts.

Nonetheless, Biddle's attorney failed to preserve his objection to the trial judge's jury instructions. "The governing rule provides that a party cannot assign as error the giving of or failure to give an instruction 'unless that party objects thereto before the jury retires to consider its verdict, stating distinctly the matter objected to and the grounds of the objection.' Fed. R. Civ. P. 51." Genlyte, 289 F.3d at 133-34. The objection "must be sufficiently specific to bring into focus the precise nature of the alleged error." Cyr v. B. Offen & Co., 501 F.2d 1145, 1155 (1st Cir. 1974) (quoting Palmer v. Hoffman, 318 U.S. 109, 119 (1942)). The purpose of this requirement is to help trial courts correct errors in jury instructions, Broderick v. Harvey, 252 F.2d 274, 276 (1st Cir. 1958), -- and thus to avoid unnecessary appeals.

To maximize the likelihood that errors can be corrected at the trial court level, parties objecting to a trial judge's instruction must not only identify the error but also "proffer a correct instruction or [otherwise] explain how the alleged error in

the charge could be corrected." Scarfo v. Cabletron Sys., Inc., 54 F.3d 931, 944 (1st Cir. 1995); see id. at 946 ("In general, objections to a trial judge's charge to the jury must be clear enough and explicit enough to tell the trial judge what the party wishes the trial judge to say in order to correct the alleged error."); Linn v. Andover Newton Theological Sch., Inc., 874 F.2d 1, 5 (1st Cir. 1989) ("If there is a problem with the instructions, the judge must be told precisely what the problem is, and as importantly, what the attorney would consider a satisfactory cure.").  The proposed correction must not substantially overstate the law in favor of the objecting party. Parker v. City of Nashua, 76 F.3d 9, 12 (1st Cir. 1996).  It is this latter part of the distinctness requirement (the proffering of a satisfactory cure) which defendants do not meet.

After the judge finished instructing the jury, Biddle's attorney objected to the formulation of the first prong of the standard for determining whether an attorney-client relationship exists. "By leaving that prong as phrased, the court has effectively held and instructed the jury that representation [by an attorney] of a representative [i.e., the holder of the power of attorney] is representation of the protected party [i.e., the grantor]. Because necessarily, the representative [or holder] is acting on behalf of the protected party [or grantor]."  But Biddle did not ask that the court instruct that there was no rule that an

-18-

attorney retained by the holder of a power of attorney was automatically in an attorney-client relationship with the grantor of a power of attorney. Rather, Biddle's position throughout was that an attorney-client relationship can never arise under these circumstances. Biddle's argument was that under Mangan, Murray had to directly ask Biddle for the service. And that argument is quite wrong; further, it did not distinctly notify the court of the argument Biddle now makes. She then compounded the problem by insisting that an instruction be given that when a representative retains a lawyer, the client is the representative, and not the party for whom the representative is working.

Our view that defendants did not distinctly state the view they now advance is reinforced by the trial judge's reaction. The trial judge rejected defendants' objection, observing:

> [T]he defendant takes the . . . extreme . . . position that the client holder of the power is automatically the client only, and it cannot be the grantor. I think that's also an incorrect statement of the law. And so I'm rejecting those particular objections.
>
> . . . .
>
> . . . Essentially, what the plaintiff has maintained here is that the grantor of a power of attorney is automatically the client of anybody the holder of the power consults at least in matters covered by the power.
>
> And the defendant essentially contends that the grantor is never the client in such circumstances. Clearly my charge has rejected both of these alternatives.

The Maine Law Court's response to certified question one,

see Estate of Keatinge, 789 A.2d at 1275-76, confirms that the district court judge correctly rejected this extreme position. Defendants proposed a "cure" which was substantively wrong and in doing so did not give the trial judge fair notice of the real problem.

In the absence of a properly preserved objection, this court reviews the trial judge's jury instructions under the plain error standard. Genlyte, 289 F.3d at 134. The party claiming plain error is required to demonstrate "(1) that there was error, (2) that it was plain, (3) that it likely altered the outcome, and (4) that it was sufficiently fundamental to threaten the fairness or integrity or public reputation of the judicial proceedings." Id. (citing United States v. Olano, 507 U.S. 725, 735-36 (1993)).

We agree that, as phrased, the portion of the instruction given had the potential to mislead the jury into thinking that an "always" per se rule existed. Still, the error was not plain and there are several reasons to think that the jury was not misled. Particular formulations in jury instructions are viewed in context, not in isolation. Here, the jury was instructed that it had to "consider all the facts and circumstances," an instruction consistent with the fact-based approach to the existence of the attorney-client relationship and inconsistent with a per se approach. Further, there were numerous facts, apart from the existence of the power of attorney, that support the jury's

conclusion that an attorney-client relationship existed.  It is highly unlikely that the error in the district court judge's instruction changed the outcome of the case.  Under the circumstances, the plain error test is not met.

B. <u>The Trial Court's Rejection of Defendants' Proposed Jury Instructions</u>

Biddle also argues that the court erred by declining to give appellant's proposed jury instructions.  Those instructions would have further defined an attorney-client relationship in light of <u>Sheinkopf</u> v. <u>Stone</u>, 927 F.2d 1259 (1st Cir. 1991).

Specifically, the defendants requested that the court advise the jury that the representation must have been sought directly by Murray (Jury Instruction No. 2); that there are a number of factors that are important to determining whether an attorney/client relationship exists (No. 3); that the client's subjective unspoken belief that an attorney was representing him is insufficient to create an attorney-client relationship (No. 4); that a client's belief must be objectively reasonable (No. 5); that the attorney must be aware that the putative client was in fact relying on the attorneys for legal counsel (No. 6); and that if a person such as Murray were regularly obtaining legal assistance from others, then it is a reasonable assumption on the part of the defendants that Murray was receiving legal assistance about his business activities from other counsel and not from the defendants

(No. 7).

A refusal to give a particular instruction constitutes reversible error only if the requested instruction was (1) correct as a matter of substantive law, (2) not substantially incorporated into the charge as rendered, and (3) integral to an important point in the case. Elliott v. S.D. Warren Co., 134 F.3d 1, 6 (1st Cir. 1998). The district court should refuse a request for an instruction that states a legal holding which is not applicable to the facts, even if it is otherwise correct. See 9A C.A. Wright & A.R. Miller, Federal Practice and Procedure § 2552 (2d ed. 2002). We find no error. The substance of many of the requests was in fact given and some had the potential to mislead. For example, the substance of Requests Nos. 2 and 5 was given, Request No. 2 was misleading, and Request No. 3 was given in the sense that the jury was told to decide the issue on all of the facts. Request No. 4 was misleading in that an attorney-client relationship may be implied, and Request No. 6 was misleading in that it eliminated the "should have known" portion of the test. Request No. 7 is closer, but it was within the discretion of the trial judge to decide that under Maine law one factor should not be emphasized over others.

As the district court noted, Sheinkopf's fact pattern is dissimilar from the one at issue in this case. In Sheinkopf, the plaintiff sued an attorney's law firm after the joint venture in which both men had invested turned sour. 927 F.2d at 1260-61,

-22-

1264-65. The case did not involve a power of attorney.[6] Biddle sought an instruction that more is required than an individual's subjective belief that the person with whom he was dealing was his lawyer; the belief, Biddle contended, must be objectively reasonable (No. 5). This request derives from the portion of Sheinkopf where the court explains that no reasonable person could have objectively believed, on the facts of that case, that an attorney-client relationship was created. The district court was well within its discretion in finding that the facts of the present case did not warrant that specific instruction, where it had already instructed that the jury should consider all the facts and circumstances and that the lawyers must have expressly or impliedly agreed to the representation. Sheinkopf did not create a set of one-size-fits-all jury instructions.

The verdict is **affirmed**. Costs are awarded against defendants.

---

[6]Nor did it involve any of the situations that the district court in the present case described as giving rise to useful analogies and parallels: a guardian-ward relationship; an agent-principle relationship; an employee-corporation relationship; or an executor- or trustee-beneficiary relationship. These are imperfect analogies to be sure, but involve situations in which a client hires a lawyer to help the client meet his legal responsibility to a third person.