GENERAL MOTORS CORPORATION,
Plaintiff,

v.

DARLING'S d/b/a Darling's
Auto Mall, Defendant.

No. CIV.01–151–B–S.

United States District Court,
D. Maine.

July 13, 2004.

Daniel L. Goldberg, Bingham McCutchen LLP, Boston, MA, Frederick J. Badger, Jr., Richardson, Whitman, Large & Badger, Bangor, ME, James C. McGrath, Bingham McCutchen LLP, Boston, MA, for plaintiff.

Judy Metcalf, Eaton Peabody, Brunswick, ME, for defendant.

## FINDINGS OF FACT AND CONCLUSIONS OF LAW

SINGAL, Chief Judge.

This is the latest installment in a line of cases arising from disagreement over the meaning and application of 10 M.R.S.A. § 1176, which requires automobile manufacturers to reimburse automobile dealers for warranty repairs "at the retail rate customarily charged" by each dealer. The suit began with a declaratory judgment action filed by an automobile manufacturer, General Motors ("GM"), to which the defendant dealer, Darling's, responded with a counterclaim. Judgment on the pleadings was entered in favor of GM on the question of whether Darling's is entitled to reimbursement on claims made more than 180 days after the date of service. At this point, the issues presented for resolution are: (1) the validity of a two-step process for reimbursement at the retail rate; (2) the validity of GM's refusal to pay certain supplemental claims on the grounds that Darling's had not provided the Vehicle Identification Number ("VIN") and date of service, as requested by GM; (3) whether GM has a right to audit and charge back improperly paid claims during the statutory period for approval or disapproval of the dealer's warranty reimbursement claims; (4) whether GM's refusal to increase Darling's initial reimbursement labor rate to fifty-two dollars per hour in the spring and summer of 2001 violated section 1176; and (5) whether GM's actions constitute unfair or deceptive trade practices under 10 M.R.S.A. § 1174. GM alleged in its Second Amended Complaint that it "currently intends to implement a procedure for processing supplemental warranty claims in the state of Maine that requires a claiming dealer to submit the information detailed in the sample form attached as Exhibit A," and asks this Court to "[d]eclare, pursuant to 28 U.S.C. § 2201, that section 1176 of the Maine Dealer Act does not prohibit GM from requiring dealers to submit the information required in ... Exhibit A ... as a condition of payment of such claims." Darling's, for its part, "respectfully requests ... entry of a permanent injunction against GM" to force GM to comply with Darling's understanding of 10 M.R.S.A. § 1176 and "restrain[ ] it from imposing an obligation upon Darling's to file the national warranty reimbursement form [Exhibit A to the Second Amended Complaint] ...

before it will abide by its obligation to reimburse Darling's."

The Court held a four-day bench trial in January 2004. Following the trial, the parties submitted proposed findings of fact and conclusions of law. Having observed the testimony and carefully reviewed the trial exhibits and post-trial filings, the Court concludes, for the reasons set forth below, that: (1) section 1176 does not prohibit the two-step reimbursement process used by GM; (2) GM is entitled to require Darling's to include the VIN and date of service on supplemental warranty claims; (3) GM has a contractual right, which does not violate section 1176, to charge back amounts paid for warranty repair reimbursement during the statutory period for approval or disapproval of the claim where Darling's failed to comply with GM's policies regarding parts retention; (4) GM's refusal to increase Darling's initial reimbursement labor rate to fifty-two dollars per hour in 2001 did not violate section 1176; and (5) there is no basis on which to conclude that GM has engaged in unfair or deceptive trade practices in violation of section 1174. The Court declines to endorse GM's proposed form on justiciability grounds. Whatever the propriety of granting injunctive relief in a case such as this, having found no violation of section 1176 on GM's part, the Court finds no basis for awarding Darling's the injunctive relief requested in its counterclaim.

## I. STATUTORY CONTEXT

The statute at issue in this case was first enacted in 1975. As indicated by the Legislature in connection with amendments to the statute, the provision is intended to protect owners of vehicles not covered by a warranty from having to subsidize warranty repairs on other consumers' vehicles because automobile manufacturers refuse to "pay the fair and full price for warranty repairs made necessary when their automobiles failed to meet warranty standards." Me. L.D. 1878, 109th Leg., 2d Sess. (1980) (Statement of Fact). At the time this litigation was initiated in 2001, the relevant portions of section 1176 read as follows:

If a motor vehicle franchisor requires or permits a motor vehicle franchisee to perform labor or provide parts in satisfaction of a warranty created by the franchisor, the franchisor shall properly and promptly fulfill its warranty obligations ... and ... shall reimburse the franchisee for any parts so provided at the retail rate customarily charged by that franchisee for the same parts when not provided in satisfaction of a warranty. Further, the franchisor shall reimburse the franchisee for any labor so performed at the retail rate customarily charged by that franchisee for the same labor when not performed in satisfaction of a warranty ... Any claim made by a franchisee for compensation for parts provided or for reimbursement for labor performed in satisfaction of a warranty must be paid within 30 days of its approval. All the claims must be either approved or disapproved within 30 days of their receipt. When any such claim is disapproved, the franchisee that submitted it must be notified in writing of its disapproval within that period, together with the specific reasons for its disapproval.

The statute was amended in 2003. As revised, the relevant parts of section 1176 read as follows:

If a motor vehicle franchisor requires or permits a motor vehicle franchisee to perform labor or provide parts in satisfaction of a warranty created by the franchisor, the franchisor shall properly and promptly fulfill its warranty obligations ... and ... shall reimburse the

franchisee for any parts so provided at the retail rate customarily charged by that franchisee for the same parts when not provided in satisfaction of a warranty. A franchisor may not otherwise recover its costs for reimbursing a franchisee for parts and labor pursuant to this section. For purposes of this section, the retail rate customarily charged by the franchisee for parts may be established by submitting to the franchisor 100 sequential nonwarranty customer-paid service repair orders or 60 days of nonwarranty customer-paid service repair orders, whichever is less in terms of total cost, covering repairs made no more than 180 days before the submission and declaring the average percentage markup. The average percentage markup so declared is the retail rate, which goes into effect 30 days following the declaration, subject to audit of the submitted repair orders by the franchisor and adjustment of the average percentage markup based on that audit. Only retail sales not involving warranty repairs, not involving state inspection, not involving routine maintenance such as changing the oil and oil filter and not involving accessories may be considered in calculating the average percentage markup. A franchisor may not require a franchisee to establish the average percentage markup by an unduly burdensome or time-consuming method or by requiring information that is unduly burdensome or time-consuming to provide, including, but not limited to, part-by-part or transaction-by-transaction calculations. A franchisee may not change the average percentage markup more than 2 times in one calendar year. Further, the franchisor shall reimburse the franchisee for any labor so performed at the retail rate customarily charged by that franchisee for the same labor when not performed in satisfaction

of a warranty ... Any claim made by a franchisee for compensation for parts provided or for reimbursement for labor performed in satisfaction of a warranty must be paid within 60 days of its approval. All the claims must be either approved or disapproved within 60 days of their receipt. A claim may be submitted within 90 days after the performance of services. When a claim is disapproved, the franchisee that submitted the claim must be notified in writing of the claim's disapproval within that period, together with the specific reasons for its disapproval.

Section 1174 of title 10 prohibits manufacturers from "engag[ing] in any action which is arbitrary, in bad faith or unconscionable and which causes damage to [motor vehicle dealers or the public]."

## II. FINDINGS OF FACT

### A. Background

GM is a Delaware corporation that manufactures automobiles and distributes them through a network of authorized dealers. Darling's is a Maine corporation that owns and operates motor vehicle dealerships in Maine. Darling's became an authorized GM dealer in 1994, and sells GM vehicles pursuant to a "Dealer Sales and Service Agreement" entered into by GM and Darling's in 2000. Under the terms of the Sales and Service Agreement, Darling's is required to perform warranty repairs on qualified vehicles at the owner's request. GM then reimburses Darling's for such repairs, following the policies set forth in the "Service Policies and Procedures Manual."

GM has established a nationwide system by which it processes claims and reimburses its dealers using a computer system dubbed "Warranty Information Network System," or "WINS." Dealers submit war-

ranty reimbursement claims to WINS electronically. These claims include the repair order number, date of service, the vehicle's VIN and mileage, the applicable labor operation number, the failed part number, and the parts reimbursement amount. WINS automatically reviews the information submitted by the dealer, together with existing computer records for the vehicle identified by VIN in the claim, to determine whether the claim meets certain basic parameters. If WINS "approves" the claim, the dealer is reimbursed based on a uniform methodology that includes a single markup for parts, a single dealer-specific average hourly rate, and GM's time guidelines for individual labor operations. Reimbursement occurs by a transfer of funds into an open account used to process credits and debits arising from various transactions between GM and the dealer. The reimbursement received through WINS is less than the retail rate customarily charged by many dealers.

Development of WINS began in 1992, and the system was implemented in 1995 and 1996. It is used by all GM dealers in the United States, Canada, Mexico and the Caribbean. GM processes approximately forty-eight million claims per year through the WINS system, paying out in excess of four billion dollars each year.[1] Before the implementation of WINS, a dealer like Darling's, which carries three lines of GM automobiles (Buick, Pontiac and GMC), was required to use three separate systems, one for each line. GM developed WINS with dealers' needs and preferences in mind, and continues to modify the system based on dealer feedback to make it more useful and convenient. In addition to facilitating claims submission for dealers, WINS provides significant utility to

GM. For example, WINS allows GM to identify recurring problems with vehicles and verify dealers' claims for reimbursement.

When a claim is received by WINS, a series of checks is performed on the data submitted, including a verification that the vehicle is within warranty coverage, that the vehicle's characteristics match the reported repairs, and that the claim was made within 180 days after the work was performed as required by the Service Policies and Procedures Manual. This electronic verification process occurs within five days of the claim submission. If the claim is approved, the dealer receives a "credit memo" from GM; if it is not approved, the dealer receives a message stating the reasons for the rejection. Claims that are approved on first submission, which constitute eighty-eight to ninety percent of claims, are paid within seven to ten days of the initial submission. After a claim has been paid, GM continues to review the warranty reimbursement request data using WINS. For example, warranty reimbursement claims are reviewed by the "Warranty Parts Center" and WINS generates monthly "dealer analysis reports," which show expense trends by dealer and allow GM to compare warranty reimbursement expenses among similarly-situated dealerships.

## B. Supplemental Warranty Reimbursement Claims

### 1. WINS Capabilities

With exceptions for dealers in three states, all GM dealers nationwide are reimbursed according to the methodology described above: a fixed forty percent markup on parts, the GM labor time guide, and

1. These figures also include some non-warranty reimbursements, such as pre-delivery inspections and repairs made on vehicles covered by extended service contracts issued by a GM subsidiary.

the dealer-specific hourly labor rate. Maine presents one of the exceptions. In New Jersey and Illinois, the other two exceptions, dealers receive elevated levels of reimbursement for parts in response to legislation governing warranty reimbursement in those states. New Jersey dealers are paid for parts using a sixty percent markup, with the exception of a small group of dealers whose markup has been determined based on each dealer's average markup as evidenced by one hundred repair orders. Similarly, most dealers in Illinois are reimbursed for parts at a forty-five percent markup. Some dealers in Illinois are reimbursed at an average rate based on one hundred repair orders, but those dealers are assessed a "cost recovery charge." WINS can accommodate these variations because each dealer has just one parts reimbursement rate.

WINS is not capable of handling multiple parts markup rates for a single dealer, or substituting dealer-specific labor times for the times supplied in the GM labor time guide. Consequently, WINS cannot fully reimburse Maine dealers at the retail rate customarily charged for *the same parts* and *the same labor* in a single step.[2] Therefore, Maine dealers whose customary retail rates exceed the amounts paid by WINS must submit supplemental warranty reimbursement claims to receive full retail reimbursement from GM.

## 2. Maine Supplemental Warranty Reimbursement Claims Process and the Utility of the VIN

To verify the accuracy of supplemental claims, GM requires that the supplemental claim include the VIN and date of repair (information included on the initial claim submission), as well as the retail parts markup percentage, the retail labor hours charged by the dealer and the method by which the labor time was calculated (information specific to the supplemental claim, not included in the initial claim). Supplemental claims are generally submitted to the dealer's Area Service Manager via electronic mail or fax. The Area Service Manager reviews the dealer requests for supplemental reimbursement using data on a laptop computer. The Area Service Manager's review includes a verification that the claim was previously submitted to and approved by WINS and a confirmation that the amount of supplemental reimbursement requested by the dealer is reasonable. Once the Area Service Manager approves the supplemental claim, the dealer is directed to submit to WINS a specially-marked claim, which is then paid electronically. The dealer is thus reimbursed at its retail rate in two installments.[3] This two-stage payment scheme was not established with the objective of circumventing or defeating the purpose of section 1176.

The Area Service Manager's computer contains approximately four months of complete paid claim data for each dealer. During the four months following the payment of a claim through WINS, the Area Service Manager can access claims by the dealer's repair order number, although the repair order number is not definitive, since it may be used multiple times by the same or a different dealer. For claims paid more than four months past (GM allows submission of supplemental claims for 180 days after the completion of the repair

2. WINS is capable of fully reimbursing dealers for parts in a single step after the 2003 amendment to section 1176, which permits parts reimbursement at an "average percentage markup." The problem of two-step reimbursement for labor remains, however.

3. To clarify the nature of the administrative burdens on each party, each automatic payment from WINS reimburses the dealer for a group of claims. Likewise, the semi-automatic payments for supplemental claims include reimbursement for multiple claims.

order), the Area Service Manager can only definitively access the claims by VIN. Without the VIN, it is much more difficult for GM personnel to access information pertaining to paid claims; in some cases, it is impossible. The VIN is required to access vehicle information from GM's "Warranty Analysis" and "Vehicle Inquiry" systems.

The VIN is a unique identifying number assigned to each vehicle when it is manufactured. The VIN is used by both manufacturers and dealers (including GM and Darling's) to organize and index records concerning a vehicle's history. GM requires that Darling's organize its files by VIN. While other numbers are assigned to a particular repair (repair order number, cycle number, etc.), none of these numbers are exclusive to a particular vehicle or pinpoint a particular repair as efficiently as the combination of the VIN and date of service.

### 3. Darling's Retail Pricing Scheme and Administrative Expenses Incurred to Submit Supplemental Claims

Darling's customary retail rates for parts and labor exceed GM's uniform reimbursement rates. Darling's determines the retail rate for parts using any one of three different systems: a matrix, which provides for a different percentage markup depending on the cost of the part; a menu, which lists a flat rate for parts and labor in connection with a particular repair; or a list consisting of the manufacturer's suggested retail price. Although most work is performed at a single hourly rate, Darling's charges different hourly rates for some operations. Moreover, like many automobile dealers, Darling's does not simply charge customers for the actual time spent performing the specific repair in question. Instead, the dealership uses one of at least seven different methods to determine the labor time charged for a particular repair. Darling's is free to change the labor rate charged for any labor operation at any time.

Darling's employs one person, Larry Rolnick, to process all supplemental warranty reimbursement claims for Darling's Ford, Volvo, Chrysler, Volkswagen, Audi, and GM lines. Mr. Rolnick is paid approximately $30,000 per year. Approximately fourteen percent of the supplemental warranty claims completed by Mr. Rolnick relate to GM vehicles. For the period from June 1, 2000 to January 31, 2002, the portion of Mr. Rolnick's salary allocable to GM supplemental claims is $6,549.[4] The sums paid by GM based on supplemental claims made during that period total $200,403.78.

### C. The VIN and Date of Service Dispute

Darling's began submitting supplemental warranty reimbursement requests to GM in June 2000. Initially, Darling's supplemental warranty reimbursement requests were submitted on a detailed spreadsheet that included the repair order number, the parts numbers, the parts reimbursement received from GM, the parts cost to Darling's, Darling's retail markup

---

4. Although Darling's attempted to show an overall cost associated with Mr. Rolnick's work on GM supplemental claims, the figure provided ($20,287 for the period from June 1, 2000 to January 31, 2002) was not reliable for a number of reasons (for example, it included overhead expenses for a location at which Mr. Rolnick did not work). As a result, the Court does not use that figure in its analysis, and relies instead on the portion of Mr. Rolnick's salary attributable to his work on GM supplemental warranty submissions. Nevertheless, even if $20,287 were the true cost of Mr. Rolnick's work on GM supplemental warranty submissions, the Court's legal conclusions as to the propriety of GM's two-step reimbursement system would remain unchanged.

percentage, Darling's retail price for the parts, and the difference between the parts reimbursement received the customary retail charge for such parts, the labor operation performed, the time allotted by GM, the time allotted by Darling's and the method by which Darling's calculated appropriate labor time, and the difference between the labor reimbursement received and the customary retail charge for such labor. The form did not include the date of service or the VIN associated with each claim.

Based on the information provided in Darling's first supplemental reimbursement requests, GM could not determine from the face of the requests whether they were made within 180 days of the repair date, as required by the Service Policies and Procedures Manual. As it turned out, none of the claims were submitted within 180 days of the repair date. Moreover, without the VIN, GM was unable to locate many of the claims or verify that the repairs were made within the 180–day period. Because of the lack of information provided, or because of errors in the information provided, the Area Service Manager sometimes had to contact Mr. Rolnick for additional information in order to complete the review of a supplemental claim.

Within thirty days of Darling's first supplemental warranty reimbursement claims, Joyce Nolan, GM's Director of Warranty Operations, wrote to John Darling, the president of Darling's, requesting the date of service and VIN corresponding to each request for retail reimbursement. Her letter stated: "[o]nce we receive this information, we will respond with procedural information on receiving payment through the Warranty Information Network System (WINS)." (Ex. J–15.) Rather than simply providing the information requested, Darling's responded with a letter asserting that "[b]ecause the statute does not require this information and because it is readily available to GM as part of the initial claim submission, we have chosen not to include it as part of our supplemental retail warranty claim sheet." (Ex. J–17.) Darling's did not identify any additional burden associated with providing the VIN and date of service on supplemental warranty reimbursement claims. In fact, John Darling admitted at trial that the amount of time required to supply the VIN in connection with supplemental claims is marginal.

After two more letters with similar content crossed in the mail, Joyce Nolan wrote to Mr. Darling explaining GM's need for "specific identification of the vehicle involved, which we cannot readily derive from the data you have submitted." (Ex. J–20.) As a "good will gesture," Ms. Nolan agreed to approve Darling's first two requests, "with the proviso that you will provide us with the applicable VINs by August 15, 2000." (Id.) Ms. Nolan further advised Mr. Darling that "[f]uture supplemental payment requests submitted without Vehicle Identification Information will not be approved." (Id.) The letter contained procedural information about how to obtain the supplemental reimbursement via WINS using a special "H-route" code.

Darling's elected not to submit an electronic request for payment to WINS, and as a result, did not receive supplemental reimbursement on those claims. John Darling argued in a July 31, 2000 letter to Ms. Nolan that the first two submissions had been "approved by default," and that he expected to receive payment from GM. (Ex. J–21.) Mr. Darling's legal position was that:

> Based on § 1176 and decisions by state and federal courts it is very clear that we do not have to provide you with anything but: (1) the original claim number; (2) the retail amount claimed;

(3) the amount of the original warranty under the national reimbursement system; (4) whether the claim is for parts or labor; (5) the difference between the original warranty claim and the supplemental retail warranty reimbursement claim.

(*Id.*) Ms. Nolan responded, again explaining the utility of the VIN number: "Under the specific circumstances of GM's existing warranty system, and given that the information you have provided is insufficient to identify the vehicle at issue without a laborious process, we do not believe it unreasonable to require that a supplemental request include the Vehicle Identification Number." Mr. Darling reiterated his position in a letter dated August 21, 2000, to which Lawrence Buonomo, GM's legal counsel, responded, again explaining GM's need for the VIN and GM's interpretation of the section 1176 case law.

Mr. Darling subsequently met with Barry Alick, the new Market Area Manager for the Bangor, Maine area, to enter into a new Dealer Sales and Service Agreement between GM and Darling's. At this meeting, Mr. Alick again explained to Mr. Darling the difficulty of accessing claims information without the VIN, but agreed to pay more than $75,000 in supplemental claims (despite the fact that many were untimely, and none contained the VIN), if Mr. Darling would "H-route" the request through WINS. Mr. Darling did so, and agreed to submit the VIN on all future supplemental warranty claims. Darling's subsequent claims included the VIN; however, some of the claims were submitted more than 180 days after the repair date. In a letter dated February 23, 2001, Joyce Nolan wrote to Mr. Darling:

We have approved those requests for reimbursement notwithstanding that they were untimely because GM is trying to work with you cooperatively on these issues and because the two requests have been pending for a considerable period of time while we considered the matter. However, going forward, GM will not approve either initial or supplemental claims for warranty reimbursement unless the claim in question is received within 180 days of the repair order date.

(Ex. J–37.) When Darling's submitted additional claims for work performed more than 180 days prior to the date of claim submission, GM denied the requests for reimbursement. In response, Mr. Darling determined that Darling's would *reduce* the information provided in supplemental warranty reimbursement claims. Mr. Darling instructed Mr. Rolnick to prepare a "short form" claim, including only: (1) the repair order number, (2) the parts reimbursement received through the initial reimbursement step, (3) the retail amount charged for those parts, (4) the difference between the dealer's retail price for the parts and the initial parts reimbursement received, (5) Darling's retail labor charge, (6) the labor amount reimbursed in the initial reimbursement process and (7) the difference between Darling's retail labor charge and the initial labor reimbursement received. The "short form" made it virtually impossible for GM to verify the amounts requested by Darling's. It also *increased* Mr. Rolnick's work load. Although GM attempted to verify the claims, it was very difficult to do so, and GM denied three sets of claims on the short form. However, since the commencement of this action, GM has processed claims on the short form to avoid unnecessary confrontation pending the Court's resolution of these issues.

The provisions of the Dealer Sales and Service Agreement (Exs. J–5 & J–6) address the informational requirements that may be imposed on a dealer by GM. Sec-

tion 11.2 states that "Dealer ... agrees to timely submit true and accurate applications or claims for payments ... and any other reports or statements required by General Motors, in the manner specified by General Motors." Section 5.2.3 reads: "Dealer and General Motors will each provide the other with such information and assistance as may reasonably be requested by the other to facilitate compliance with applicable laws, regulations, investigations and orders relating to Products." Finally, Section 13.1.7 provides that "[r]efusal by Dealer to timely furnish sales, service or financial information and related supporting data, or to permit General Motors examination or audit of Dealer's accounts and records" constitutes a "material breach[ ]" of the agreement.

### D. The Audit and Charge–Back Dispute

The Sales and Service Agreement and the Service Policies and Procedures Manual provide that GM is entitled to audit Darling's warranty claims. As part of its monitoring of warranty claims, GM monitors certain categories of information to detect out-of-line warranty costs and expenses. Where a dealer exhibits elevated warranty levels, GM notifies the dealer and provides it with materials to conduct a "Dealer Self–Review." There are three levels of Dealer Self–Review before GM performs a "Claims Expense Review" or a more extensive audit. The Dealer Self–

Reviews allow the dealer itself to investigate the targeted concerns, to identify any instances in which it has over-charged GM and should be debited sums received, and to correct any irregularities. If the Dealer Self–Reviews do not satisfactorily address GM's concerns, GM has the authority to perform a "Claims Expense Review," in which GM employees review the records of the dealership at the dealership location.

After three Dealer Self Reviews in 1999 and 2000, a Claims Expense Review was performed at Darling's GM dealership on August 1, 2000. The claims expense review revealed that Darling's had failed to comply with GM's procedures in four respects: (1) it had charged GM for excessive extra labor hours on repairs; (2) it had charged GM for "goodwill" adjustments made on repair bills for vehicles covered by extended service contracts; (3) it had failed to make parts replaced during warranty repairs available for inspection by GM; and (4) it had charged GM for "goodwill" adjustments made on repair bills for vehicles in Darling's used vehicle inventory. As a result of these failures, GM debited Darling's account $4,244.67, the amount of excessive charges to GM in the first three categories. After correspondence between the parties, GM agreed to re-credit Darling's all amounts except for $1,278.96, the amount paid to Darling's for warranty repairs for which Darling's did not retain parts as required by the Service Policies and Procedures Manual.[5]

---

5. The relevant portions of Section 1.7.3 of the 2000 Service Policies and Procedures Manual, titled "Disposition of Material," read as follows:

Policies covering the disposition of parts and materials removed from vehicles in conjunction with warranty ... repairs are as follows:

- Following a warranty repair, all parts are to be turned into the parts department by technicians for tagging, retention and/or return.

- Warranty part tags are to contain both the repair order and vehicle identification numbers and date of repair order completion.... Warranty parts are to be kept in a clean, well-lit, and ventilated area.
- Dealer is to retain for scrapping/return all parts for a minimum of 15 days from the credit memo date showing payment or until scrapped by a GM representative, whichever comes first. GM may request dealer to retain warranty and transportation parts beyond the 15 day require-

### E. The WINS Labor Rate Reimbursement Dispute

Where a dealer charges different retail labor rates depending on the type of repair, GM requests that the dealer compute a single warranty labor rate by calculating the average actual customer-pay experience. To make this calculation, GM requests that the dealer submit one hundred sequential non-warranty repair orders (a process almost identical to that authorized by the revised section 1176 for calculating the retail rate customarily charged for parts). By letter dated September 5, 2000, Darling's notified GM that it would request a warranty labor rate increase from $48.95 to $52.00 per hour to match its posted retail rate. Several months later, Darling's submitted a "Warranty Labor Rate Application" dated April 5, 2001, together with a "Labor Rate Verification Form." The Labor Rate Verification Form, which included the calculation referenced above using one hundred sequential repair orders, indicated that Darling's "effective labor rate," the average rate charged over one hundred sequential repair orders, was only $51.58 per hour. As a result, GM notified Darling's by letter dated April 17, 2001, that its request for an increase in the labor rate used in the initial reimbursement step had been denied. Darling's responded by letter dated June 5, 2001, objecting to GM's failure to increase the warranty labor rate and stating that the warranty labor rate should be increased to the effective labor rate of $51.58 per hour. By letter dated June 14, 2001, GM advised Darling's that it would increase Darling's initial warranty reimbursement rate to $51.58 per hour upon receipt of a revised Warranty Labor Rate Application.[6] Darling's elected not to submit a revised form, and as a result, continued to receive reimbursement at $48.95 per hour in the initial reimbursement stage. GM continued to pay Darling's the difference between the posted retail labor rate and the effective warranty labor rate where appropriate in response to supplemental claims submitted by Darling's.

### III. CONCLUSIONS OF LAW

Based on the foregoing findings of fact, the Court makes the following conclusions of law:

1. Section 1176 does not by its terms require that dealers be reimbursed

---

ment, if deemed appropriate. Such notification will be in writing.
- Retain all core parts until date of claim payment. Then, return them to the Warranty Parts Center, if requested, or to a GM approved rebuilder/remanufacturer. Dealer is to retain and make available proof of return shipment (i.e., the shipping receipt)....
- Parts not requested within the 15 day retention period, or scrapped by GM representative, *ARE TO BE DAMAGED BEYOND FURTHER USE AND SCRAPPED BY DEALER.* Under no circumstances are warranty parts to be installed on any vehicle, sold at retail, salvage, or used in any other application.
  . . .
- Any parts listed on a warranty claim return (except core parts and those request-

ed by the WPC) that are not in the parts storage area or made available for inspection/scrapping, may result in a complete claim debit.
- GM dealer Audit Staff may direct dealer to retain parts beyond the 15 day retention requirement when conducting an audit. Upon completion of the audit, GM dealer Audit Staff will provide a scrapping date for involved parts.

(Ex. J–9) (emphases and typographical errors in original).

6. The Warranty Labor Rate Application is a four-page form. Although usually accompanied by supporting documentation, GM informed Darling's that it did not need to resubmit the supporting documentation. A revised form could have been completed by a Darling's employee in a matter of minutes.

for warranty repairs in a single payment.

2. The two-step system used by GM to reimburse Maine dealers for warranty repairs at their retail rates is not unlawful.

3. GM's refusal to increase Darling's initial reimbursement labor rate does not constitute a violation of section 1176.

4. GM has a contractual right to require Darling's to include the VIN and date of service on supplemental warranty reimbursement claims.

5. GM's contractual right is not restricted by section 1176, as interpreted by the Maine Supreme Judicial Court.

6. GM has a contractual right to charge back amounts paid to Darling's for warranty reimbursement where Darling's failed to comply with the terms of the contract regarding parts retention.

7. Section 1176 is not violated when this charge-back right is exercised during the statutory period for approval or disapproval of a warranty reimbursement claim.

8. In the disputes presented to the Court, GM has not engaged in actions which were "arbitrary, in bad faith or unconscionable" and which caused damage to Darling's or the public in violation of 10 M.R.S.A. § 1174.

9. In light of the fact that GM's Maine Supplemental Warranty Payment Request form (presented as Exhibit A to the Second Amended Complaint) has not been used in connection with supplemental warranty reimbursement claims, there is no justiciable controversy as to the form.

10. There is no basis on which to order an injunction against GM prohibiting further violation of section 1176 in light of the Court's conclusion that there has been no violation of section 1176.

## IV.  DISCUSSION

Before delving into the substantive questions presented in this case, the proper allocation of burdens of proof between the parties should be resolved.  GM states that Darling's bears the burden of persuasion on each of the parties' claims because Darling's is the party seeking affirmative relief.[7]  Darling's argues that GM bears the burden of proving that the two-step warranty reimbursement process is "the same as the single claim required by the statute."  (Def.'s Closing Arg. at 2.)  Darling's makes no argument with respect to the burden of proof for the remaining issues presented, and as such is presumed to agree that it bears the burden of proof as to the remaining issues.

■ Turning, then, to the question of which party bears the burden of proof as to the validity of the two-step warranty reimbursement process, *Hodgdon v. Campbell* teaches that "both fairness and the nature of declaratory relief dictate that the allocation of the burden of proof in declaratory judgment actions must be determined by reference to the substantive gravamen of the complaint."  411 A.2d 667, 670 (Me.1980).  "The party who asserts the affirmative of the controlling issues in the case, whether or not he is the nominal plaintiff in the action, bears

7.  GM does note that it bears the burden of persuasion as to its affirmative defense of accord and satisfaction.

the risk of non-persuasion." *Id.* at 670–71. Because Darling's is the party asserting a statutory violation by GM, Darling's bears the burden of persuasion on the issue of whether the two-step warranty reimbursement process violates section 1176.[8] Darling's argument to the contrary is hopelessly circular, and would require resolution of the substantive issue (whether a two-step process is permitted by the statute) before resolution of the burden of proof question.

### A. The Validity of a Two–Step Warranty Reimbursement Process

Turning, then, to the substantive issues before the Court, Darling's argues that section 1176 only allows for a one-step reimbursement at the retail rate, not the two-step process currently in place. It contends that the "everyday language" of the statute indicates that "once a dealer has submitted *a* claim, there is only one rate at which it can be paid: the retail rate customarily charged by the dealer for these parts and labor." (Def.'s Closing Arg. at 3.) Darling's maintains that after the administrative costs it incurs to complete supplemental claims, it does not recover the customary retail rate for warranty repairs, defeating the purpose of the statute. Darling's further asserts that GM could adjust its computer system to comply with Maine law but simply refuses to do so. Darling's also argues that GM's process is made cumbersome to deter other dealers from seeking the reimbursements they are legally entitled to.

GM argues that the case law interpreting section 1176 implicitly recognizes the validity of a two-stage retail reimbursement system, with one claim processed and paid by the computerized nationwide system and a second claim for the difference between the amount paid via the nationwide system and the retail rate customarily charged. Although none of the cases interpreting section 1176 to date have specifically addressed the procedure by which warranty reimbursement claims are processed, GM argues that it would be anomalous for the Maine Supreme Judicial Court (in *Darling's v. Ford Motor Co.*, 719 A.2d 111 (Me.1998) ("*Darling's Ford II*")) and for this Court (in *Darling's v. Ford Motor Co.*, No. 95–398–B–H (D.Me. Apr. 1, 1998) ("*Darling's Ford I*")) to have implicitly endorsed a system that is illegal and contrary to the statute.[9] GM argues that its computer system is simply incapable of handling the various rates at which Darling's charges customers for repairs, and that any administrative costs that Darling's incurs to submit supplemental claims are a normal cost of doing business.

### 1. Statutory Construction

In addressing issues of statutory construction under section 1176–A (a statutory provision separate from section 1176), the Maine Supreme Judicial Court listed some basic guidelines of statutory inter-

---

8. Thus, Darling's would have borne the burden of proof on each of the claims regardless of its waiver of arguments to the contrary.

9. In *Darling's Ford I* Judge Hornby certified a number of questions regarding the interpretation of section 1176 to the Maine Supreme Judicial Court. Among the questions certified were: "Does section 1176 require a dealer/franchisee to make a 'particularized claim' to a manufacturer in seeking reimbursement for warranty work?" and "If yes, does a for-

mal demand letter specifying (a) the original computerized claim number, (b) the retail amount claimed; (c) the amount the dealer received under the nationalized system; (d) the nature of the claim (parts or labor); and (e) the difference between the amount received and the retail price, meet the particularized claim requirement?" In *Darling's Ford II*, the Maine Supreme Judicial Court answered both questions in the affirmative.

pretation. *Darling's v. Ford Motor Co.,* 825 A.2d 344, 346 (Me.2003) (*"Darling's Ford III"*). It wrote:

> [W]e seek to give effect to the intent of the Legislature by examining the plain meaning of the statutory language and considering the language in the context of the whole statutory scheme. We avoid statutory constructions that create absurd, illogical or inconsistent results.... We first examine a statute's plain meaning, and only look beyond that language to the legislative history to determine the intent of the Legislature if we find the statute ambiguous.

*Id.* (internal citations and quotations omitted). Having examined the plain language of the statute in the context of the statutory scheme, the Court finds no indication that the Maine Legislature intended to dictate the *mechanism* by which dealers would be reimbursed for warranty repairs. Moreover, contrary to Darling's assertion, there is no requirement in the express language of the statute that requires that the retail reimbursement be paid in one lump sum. It would be ill-advised for this Court to draft such a requirement into the statute. *See Acadia Motors, Inc. v. Ford Motor Co.,* 44 F.3d 1050, 1057 (1st Cir. 1995) ("It is not appropriate for a federal district court, however well-intentioned, to set forth a rule unsupported by a state statute.").

## 2. Factual Circumstances

■ Having concluded that a two-step reimbursement system does not constitute a facial violation of section 1176, and having found that the two-step reimbursement system was not created with the intent to circumvent or defeat the purpose of the statute, the Court turns to the main factual question presented: whether GM's process unreasonably interferes with or prevents reimbursement at the retail rate. Stated differently, is the process of obtaining reimbursement at the retail rate so complicated and costly that it circumvents the purposes of the statute by preventing or unreasonably interfering with reimbursement at the retail rate? To resolve this question, the Court first looks to the administrative costs incurred by Darling's in submitting supplemental claims. Then, the Court examines the evidence as to the potential cost to GM of altering its system of processing warranty reimbursement claims. Finally, the Court responds to the dispute over the proper labor rate for warranty reimbursement at the initial reimbursement stage.

### a. Administrative Costs

Returning to the facts, the portion of Larry Rolnick's salary attributable to GM supplemental warranty reimbursement claims for the period from June 1, 2000 to January 31, 2002 is $6,549. The total supplemental warranty reimbursement received from GM for claims submitted during that period is $200,403.78. In light of the significant returns, and the minimal administrative cost of submitting supplemental claims experienced by Darling's, the two-step warranty reimbursement process does not appear to unreasonably burden Darling's or discourage the submission of supplemental claims.[10] While a reimbursement process which would unduly burden Darling's is not inconceivable, this is not a close case, and as such, the Court is not obligated to determine the precise point at which high administrative costs of seeking retail reimbursement would cir-

---

10. The Court notes that the result on this issue would be the same if GM bore the burden of proof and, as mentioned above, if the Court were to use Darling's elevated $20,287 calculation of the cost of submitting supplemental warranty reimbursement claims to GM.

cumvent the purpose of the statute. Darling's argument that the administrative costs incurred in submitting the supplemental claim effectively decrease the amount received from GM such that Darling's is not reimbursed at the retail rate is not convincing. Administrative costs are a part of every business enterprise, and some such costs must be incurred to reap the benefits of having engaged in the primary business. The administrative costs are not so out-of-line in this case as to raise concerns about whether Darling's is truly being reimbursed at its retail rate as a result of the administrative costs involved in filing supplemental claims. To analogize, the cost to Darling's would be greater if all warranty reimbursement claims were to be filed on paper and sent via certified mail to both GM's main and regional offices, but even this more antiquated claims system would not necessarily render GM's warranty reimbursement process illegal.

The fact that many Maine dealers do not submit supplemental warranty reimbursement claims is significant. However, there is no evidence as to why those dealers do not submit supplemental warranty claims, and the range of possibilities is too broad to infer that those dealers are discouraged from making supplemental claims by the administrative burdens of the two-step process. Thus, the mere fact that some other dealers do not submit such claims has limited probative value, in light of the financial data showing that submitting supplemental claims is clearly worthwhile for Darling's.

### b. Feasibility of Technical Improvements

Another factor to consider in determining whether the two-step retail reimbursement scheme is unduly burdensome to Darling's is the feasibility of GM adjusting its computer system to pay Maine dealers their retail rates in a single step. All the evidence indicates that it would be exceptionally difficult, if not impossible, for GM to modify WINS to include every Maine dealer's retail rate for every labor operation and part. Darling's suggests that if WINS is incapable of reviewing Maine dealers' claims in one step, all such claims should be reviewed manually in the first instance. This is clearly not a viable suggestion. Large numbers of warranty reimbursement claims are made by Maine dealers each year. Reverting to a manual system would significantly hamper the warranty reimbursement process and interfere with GM's monitoring of dealer expenses and vehicle quality and performance, with results undesirable to the manufacturer, the dealer and consumers.

Darling's also contends that GM acted unreasonably in its development of WINS because section 1176 was in effect well before the introduction of WINS. Therefore, Darling's argues, GM should not be afforded any sympathy in its claims of administrative difficulty: it brought that difficulty upon itself by failing to incorporate existing legal requirements into its computer system. However, in light of the fact that the language of the statute does not prohibit a two-step reimbursement process, there is no basis for this Court to conclude that GM's decision to develop a computer system for nationwide use was unreasonable even if the computer system would require some manual processing and supplemental claims in Maine. GM's decision to develop a computer system that works full-time in most states and part-time in others (like Maine) is not unreasonable.

### c. The Initial Warranty Reimbursement Labor Rate "Dispute"

Finally, the parties dispute whether GM properly refused to increase the warranty

reimbursement labor rate used by WINS in the initial step of the two-step reimbursement process. Although this question was initially presented as a separate count of Darling's counterclaim, in light of the Court's conclusion that a two-step reimbursement system does not violate the express language of section 1176, the issue of GM's "refusal" to increase Darling's labor rate in the initial reimbursement stage is probative only as to whether GM has complicated the reimbursement process to the extent that dealers are discouraged from making supplemental claims. The evidence does not support such a conclusion.

As explained above, the labor rate used by WINS is an average labor rate calculated by averaging the labor rates charged in one hundred sequential non-warranty repair orders. Darling's requested an increase in its warranty reimbursement labor rate from $48.95 per hour to $52.00 per hour, but the paperwork it submitted indicated that its effective labor rate was only $51.58 per hour.[11] GM denied Darling's request for an increase in the labor rate used in the initial reimbursement step, but explained that it would increase Darling's initial warranty reimbursement rate to $51.58 upon Darling's submission of a revised Warranty Labor Rate Application Darling's did not submit a revised

form. There is no allegation that Darling's did not receive its retail labor rate following the second reimbursement installments.[12]

There is no indication that GM was unwilling to increase Darling's initial labor reimbursement rate to the effective labor rate upon Darling's submission of a request to that effect.[13] The form requested by GM was simply a recordkeeping matter, easily completed by Darling's. The administrative burden to Darling's of completing a revised form was virtually nonexistent. Darling's refusal to comply does not constitute evidence that the reimbursement process is so complicated that a reasonable dealer would be discouraged from seeking full retail reimbursement.

To conclude, the two-step process does not violate the express language of section 1176, nor do the facts demonstrate that it prevents or unreasonably interferes with reimbursement at the retail rates.

## B. The VIN and Date of Service Requirements

The next disputed issue is what information GM may require Darling's to submit in connection with supplemental warranty reimbursement claims. Darling's, relying on *Darling's Ford II*,[14] previously argued

---

11. This discrepancy between the reported labor rate and the average labor rate is attributable to a single wheel alignment, for which the customer was charged $45.50 for 1.5 hours of labor. Darling's argues that wheel alignment is a recognized industry "loss leader," and should not affect the calculation of the effective labor rate. In the absence of a facial requirement that GM reimburse dealers in one fell swoop, this argument is of little consequence to Darling's contention that the factual circumstances surrounding the two-step reimbursement process constitute a violation of section 1176.

12. It is useful to note that the main source of contention between the parties regarding la-

bor reimbursement is not the hourly rate charged for labor, but *how many hours* should be charged for a given labor operation.

13. The Court notes the implausibility of a scheme to deter supplemental claims by keeping reimbursement at the initial stage low— this would encourage dealers to make supplemental claims, not discourage them.

14. In *Darling's Ford II*, the Maine Supreme Judicial Court held that the objectives of section 1176 "necessarily require[] that a dealer submit a claim that is sufficiently individualized to enable a manufacturer to satisfy these obligations." *Id.* at 114. Where the manufacturer (which used a computer system similar

that section 1176 only required the dealer to provide the claim number, the retail amount claimed, the amount received under the nationalized system, the nature of the claim (parts or labor) and the difference between the amount received and the retail price. This Court ruled at summary judgment that Darling's interpretation of *Darling's Ford II* was "unnecessarily narrow." Now, Darling's argues that it is entitled to $22,175.55 for claims it submitted on the "short form" that included only the information above because GM was able to access the information for those claims in spite of Darling's refusal to provide the VIN and date of service. In short, Darling's argues that *Darling's Ford II* stands for the proposition that where a dealer can authenticate its rates by a valid means, the dealer need not comply with the specific demands of the manufacturer. GM's position is that it is entitled to require Darling's to provide basic information such as an automobile's VIN and date of service in a supplemental claim, because the case law provides that it is entitled to a sufficiently individualized claim "informing it of the pertinent facts

regarding the claim," *Darling's Ford II*, 719 A.2d at 115 (quoting *Acadia Motors, Inc. v. Ford Motor Co.*, 844 F.Supp. 819, 828 (D.Me.1994)), and the computer system used by GM to reimburse dealers is difficult or impossible to access without such information. As with Darling's previous interpretation of *Darling's Ford II*, Darling's current interpretation is unduly narrow.

■ As explained above, the evidence shows that including the date of service and VIN on the supplemental claim would greatly facilitate the claims administration process. Together, the VIN and date of service definitively identify a specific repair. Moreover, the information that Darling's refused to provide to GM was readily available to it and would have required only marginal time and effort to provide. Under these circumstances and on the facts presented, it hardly seems unreasonable for GM to require Darling's to include the VIN and date of service corresponding to requests for supplemental reimbursement.[15]

to WINS) refused to honor supplemental claims, Judge Hornby had found (in *Darling's Ford I*) that Darling's had satisfied the individualized claim requirement where it submitted to the manufacturer a demand letter specifying the claim number, retail amount claimed, the amount received from the computerized system, whether the claim was for parts or labor, and the difference between the amount received and the retail price. *Id.* at 115. The Maine Supreme Judicial Court found that Judge Hornby's decision was sufficient to show that Darling's claim met the statutory requirement for an individualized claim. *Id.* Nowhere in the opinion did the court hold that the items included in Darling's letters to Ford constituted the *only* items that a manufacturer could request from a dealer in handling supplemental warranty reimbursement claims. As to the manufacturer's verification of claims, the court wrote:

The statute does not prohibit the manufacturer from imposing reasonable verification

requirements on dealers or from imposing a time limit on submitting claims for reimbursement. Allowing manufacturers to impose reasonable verification requirements is consistent with the statute's legislative purpose to protect consumers, because it provides a mechanism to ensure that dealers submit claims for reimbursement at bona fide rates.

*Id.* at 117.

15. In *Darling's v. Daimler Chrysler Motors Co.*, Nos. AP–2003–17, AP–2003–18, AP–2003–19, and AP–2003–20, 2004 WL 1598682 (Me.Super.Ct. May 10, 2004), the Maine Superior Court affirmed a decision of the Maine District Court which held that Darling's supplemental warranty reimbursement claims were sufficient under section 1176, despite the fact that they did not include the VIN, as requested by Chrysler. The facts in the Chrysler case are unclear, but based on the facts adduced at trial in this case, the VIN is

Thus, the Court concludes that the VIN number and date of service are reasonably necessary to the processing of Darling's supplemental claims and that GM is well within its rights under section 1176 to require the VIN and date of service as part of a "sufficiently individualized" claim. Moreover, GM has a right to such information pursuant to the contract between it and Darling's.[16]

## C. Charge-backs During the Statutory Period

The next source of contention between the parties is GM's debit of $1,278.96 from Darling's account after the August 2000 Claims Expense Review because Darling's did not retain failed parts as required by the Service Policies and Procedures Manual.[17] As laid out above, the version of section 1176 in effect at the initiation of this litigation provided that a claim made for warranty reimbursement must be approved or disapproved within thirty days of receipt and paid within thirty days of its approval.[18] GM believes that within that

statutory time period, it has a contractual right to perform audits of warranty claims and to charge back amounts improperly paid. Darling's argues that GM has no contractual right to debit Darling's account for failure to retain parts as required by the Service Policies and Procedures Manual. The Court first analyzes the contractual provisions agreed to by the parties, then evaluates the effect of section 1176 on the parties' contractual rights and obligations.

### 1. The Contract between GM and Darling's

As detailed in the Findings of Fact above, the Dealer Sales and Service Agreement requires Darling's to provide service "in accordance with ... the Service Policies and Procedures Manual, as amended from time to time." Section 1.7.3 of the 2000 Service Policies and Procedures Manual, in turn, requires dealers to retain parts removed during warranty repairs for fifteen days following reimbursement. It also states that "[a]ny parts list-

so integral to GM's information processing, and so easy for Darling's to provide that in this case the VIN (and date of service) constitute "pertinent facts informing [the manufacturer] of the pertinent facts regarding the claim that would enable it to determine whether the claim should be approved or denied." *Darling's Ford II*, 719 A.2d at 115 (quoting *Acadia Motors, Inc. v. Ford Motor Co.*, 844 F.Supp. 819, 828 (D.Me.1994)).

16. As noted in the Conclusions of Law above, in the absence of an attempt on GM's part to implement a supplemental warranty reimbursement procedure using the form attached to the Second Amended Complaint as Exhibit A, the dispute over the form is not justiciable, and the Court declines to make any declaration about the form itself. However, based on the foregoing discussion and legal conclusions, there is no reason to believe that a GM form requesting the VIN and date of service in connection with a supplemental warranty reimbursement claim would violate section 1176 because it requested such information.

17. Going into trial, the parties disputed whether or not GM could charge back amounts improperly paid after the expiration of the statutory period. However, Darling's has not argued the point in its post-trial submissions, thereby waiving the issue. Even if the issue of charge-backs outside the statutory period had not been waived, there was no injury and no live controversy, because there is no dispute that GM reversed charge-backs on claims submitted more than thirty days prior to the charge-back. Thus, the only issue addressed by the Court is whether or not GM may debit Darling's account during the statutory period for approval or disapproval of claims. The Court expresses no opinion as to whether section 1176 permits charge-backs outside of the statutory period for approval or disapproval of a warranty reimbursement claim.

18. The current version of the statute requires that claims must be paid within sixty days of approval, and that claims must be approved or disapproved within sixty days of receipt.

ed on a warranty claim return (except core parts and those requested by the WPC) that are not in the parts storage area or made available for inspection/scrapping, may result in a complete claim debit" (closing parenthesis omitted in original).

In its post-trial submissions, Darling's alternately insists that "[t]he only language which relates to the right to charge back for parts retention matters is if GM finds that a dealer failed to retain a part *which had been specifically requested by the Warranty Parts Center,* pursuant to section 1.7.3," (Def.'s Closing Arg. at 16) (emphasis in original), and urges the Court to find that "[t]he Policy and Procedure Manual for 2000 contains no chargeback rights with regard to failure to abide by parts retention policy," (Def's Closing Arg. at 39.) Based on the plain language of the Policy and Procedure Manual quoted above, it would be clear error for this Court to conclude (despite the missing closing parenthesis) that there is no charge-back right whatsoever in connection with the parts retention policy.

It is unclear on what basis Darling's argues that GM may only debit for failure to retain parts specifically requested by the Warranty Parts Center, but perhaps the missing parenthesis in the above-quoted language from Section 1.7.3 is the culprit.[19] The most obvious placement for the closing parenthesis is after "WPC" and before "that," so that the sentence reads: "[a]ny parts listed on a warranty claim return (except core parts and those requested by the WPC) that are not in the parts storage area or made available for inspection/scrapping, may result in a complete claim debit." This placement makes

sense in light of the provision of Sections 1.7.3 and 1.7.4 which require the dealer to send core parts to the Warranty Parts Center upon reimbursement and to send other parts to the Warranty Parts Center upon request. Because core parts and parts requested by the Warranty Parts Center would already have been sent away, a dealer would not be able to make those parts available for inspection.

A less plausible placement of the closing parenthesis would be to place it after "parts" and before "and those requested," such that the sentence would read: "[a]ny parts listed on a warranty claim return (except core parts) and those requested by the WPC that are not in the parts storage area or made available for inspection/scrapping, may result in a complete claim debit." The most plausible reading of this less-plausible parenthesis placement would be to understand "parts listed on a warranty claim return" and "those requested by the WPC" as two different categories. The least plausible reading of this less-plausible placement would be to understand GM's debit right as pertaining only to parts listed on warranty claim return that had been requested by the WPC. This strained reading would require a disregard of the word "those," basically rewriting the sentence to read "any parts listed on a warranty claim return and requested by the WPC ..." This very strained reading of a sentence afflicted with a typographical error simply does not pass the "straight face" test.

■ Thus, as the Court reads the 2000 Service Policies and Procedure Manual, GM has a contractual right to debit claims

---

**19.** In connection with its arguments regarding charge-backs, Darling's repeatedly argues in its post-trial submissions that ambiguities in the contract must be read against GM, the drafter. While the terms contained in the Policies and Procedures Manual are by no means artfully crafted, the Court does not consider them to be ambiguous as to whether or not GM has a right to debit Darling's account for failure to abide by the parts retention policies outlined in the Policies and Procedures Manual.

previously paid to Darling's if Darling's fails to retain parts removed in the course of warranty repairs for fifteen days following reimbursement for such repairs.

### 2. Section 1176 and Charge–Backs for Failure to Retain Parts

■ The Court finds no basis on which to conclude that a debit during the statutory time frame for approving or disapproving a claim violates section 1176. The contractual language between GM and Darling's makes clear that GM may pay, then "unpay" Darling's for warranty repairs. Section 1176 states that the manufacturer has thirty (now sixty) days in which to approve or disapprove a claim, and that payment must be made within thirty (now sixty) days of a claim's approval. The fact that GM pays first, then approves or disapproves claims, does not render a disapproval during the statutory period unlawful. Moreover, section 1176 is a consumer protection statute, aimed at ensuring that manufacturers pay the full cost of warranty repairs so that automobile owners whose vehicles are not covered by warranty are not forced to subsidize warranty repairs on other vehicles. Darling's has not contested GM's assertion that this method of processing claims is the cheapest. To rule that charge-backs within the statutory period for approval or disapproval are disallowed by section 1176 would require GM to thoroughly review each claim before paying it, at increased cost to GM, cost that would inevitably be passed on to the consumer, violating the spirit of section 1176.

### D. 10 M.R.S.A. § 1174

Because the Court has found no violation of section 1176 and no other indication of behavior on GM's part that was "arbitrary, in bad faith or unconscionable" and that caused damage to Darling's or the public, there is no basis on which to conclude that GM has violated 10 M.R.S.A. § 1174.

For the reasons set forth above, the Court hereby ORDERS that judgment be entered in favor of Plaintiff on all remaining counts of the complaint and counterclaim.

SO ORDERED.